IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BILLY JO ANDERSON,

          Plaintiff,

          v.                                 Civil Action No. 1:09-CV-125

MICHAEL J. ASTRUE,
Commissioner of Social Security,

          Defendant.


## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.      Background

     Plaintiff, Billy Jo Anderson (Claimant), filed a Complaint on August 27, 2009, seeking Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1] Commissioner filed his Answer on March 4, 2010.[2] Claimant filed his Motion for Summary Judgment on April 5, 2010.[3] Commissioner filed his Motion for Summary Judgment on April 27, 2010.[4]

B.      The Pleadings

     1.      Plaintiff's Brief in Support of Motion for Summary Judgment.

---

[1] Docket No. 3.

[2] Docket No. 5.

[3] Docket No. 8.

[4] Docket No. 10.

1

2. <u>Defendant's Brief in Support of Motion for Summary Judgment</u>.

C. <u>Recommendation</u>

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be **DENIED** and the matter be **REMANDED** because the ALJ did not adequately set forth the reasons for discrediting Claimant's subjective complaints and symptoms.

2. Commissioner's Motion for Summary Judgment be **DENIED** and the matter be **REMANDED** for the same reason set forth above.

## II. Facts

A. <u>Procedural History</u>

Claimant filed an application for Disability Insurance Benefits (DBI) and Supplemental Security Income (SSI) on December 22, 2004, alleging disability due to Post Traumatic Stress Disorder (PTSD), Menear's Disease, fibromyalgia, general fatigue syndrome, muscle disorder undiagnosed, and arthritis beginning October 20, 2004. (Tr. 94-97). The claim was denied initially on March 15, 2005, and upon reconsideration on January 10, 2006. (Tr. 72, 71). Claimant filed a written request for a hearing on March 7, 2006. (Tr. 82). Claimant's request was granted and a hearing was held on April 6, 2007. (Tr. 29-70).

The ALJ issued an unfavorable decision on July 2, 2007. (Tr. 12-24). The ALJ determined Claimant had no impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926), and there are jobs that exist in significant numbers in the national economy that the Claimant can perform (20 CFR

404.1560(c), 404.1566, 416.960(c), 416.966).  (Tr. 19-23).  On August 28, 2007, Claimant filed

a request for review of that determination.  (Tr. 10-11).  The request for review was denied by

the Appeals Council on June 26, 2009.  (Tr. 4-6).  Therefore, on June 26, 2009, the ALJ's

decision became the final decision of the Commissioner.

Having exhausted her administrative remedies, Claimant filed a Complaint with this

Court seeking judicial review of the Commissioner's final decision.

B.     Personal History

Claimant was born on June 28, 1960, and was forty-four (44) years old as of the onset

date of his alleged disability and forty-seven (47) as of the date of the ALJ's decision.  (Tr. 94).

Claimant was therefore considered a "younger person," under the age of 50 and, generally,

whose age will not seriously affect the ability to adjust to other work, under the Commissioner's

regulations at the time of her onset date and at the time of the ALJ's decision.  20 C.F.R. §§

404.1563(c), 416.963(c) (2009).  Claimant graduated from college and completed one year of

post-graduate work.  (Tr. 35).  Claimant has previous work experience as a customer service

worker, a cashier, and a telemarketer and in telecommunications.  (Tr. 41, 67, 110).

C.     Medical History

The following medical history is relevant to the issue of whether substantial evidence

supports the ALJ's determination that Claimant's subjective complaints were not entirely

credible:

**Medical Records, WVU Hospital, 6/29/87 - 11/2/87 (Tr. 280-97)**
6/29/87
- referred for Vertigo and headaches
- complaints: occasional weakness; occasional numbness in hands; memory loss
- assessment: headaches; vertigo?; Meniere's Disease?; labryrinthitis?; MS?
- plan: MRI; audiogram; illegible

8/3/87
- complaints: headaches - improved; vertigo - worsened; difficulty with balancing
- plan: VEP; BAEP
8/13/87
- comment: normal central auditory conduction
- visual acuity: 20/20 in both right and left eyes
- pattern shift visual evoked responses: normal study
9/14/87
- complaints: daily headaches; vertigo; difficulty sleeping
- objective: VEPs; BAEPs
10/2/87
- background: history of balance problems; normal audiogram, VEP, and BAEP; normal MRI except cerebro-pontine angle was not specifically scanned; vascular headaches; told to decrease coffee consumption
- complaints: in addition to longstanding, problems with both long- and short-term memory; diminished appetite; diminished interests
- physical exam: normal
- assessment: chronic and recurrent dizziness, nausea, and tinnitus with extensive negative workup in the past–rule out Meniere's Disease or syphilitic etiology; vascular headaches; probable some component of depression
- plan: ENG; MHA-STS; consider psychiatric referral
11/2/87
- problem: headaches; vertigo
- assessment: no improvement in symptoms
- plan: ENG

**Medical Record, Dr. Hilsbos, Fairmont Clinic, 2/23/00 (Tr. 298-99)**
- assessment: Meniere's Disease; anxiety and depression
- plan: Prozac; renewed prescription for potassium chloride, hydrochlorothiazide, and Meclizine; referred to Ruby Hospital

**Medical Records, Fairmont Hospital, 9/22/01 - 2/5/05 (Tr. 211-29)**
9/22/01
- MRI brain without contrast
- impression: normal appearance
9/30/03
- chest x-ray
- impression: normal appearance
10/17/03
- procedures: cyto-spin prep
- ovarian fluid cytology - right ovarian cyst fluid
- final diagnosis: right ovary, fluid, cytospin preparation, cytology
10/17/03
- preoperative diagnosis: dysfunctional uterine bleeding; pelvic pain; tender uterus

- final diagnosis: endocervix, curettage - benign endocervical and squamous epithelium; endometrium, currettage - late secretory phase endometrium; right ovary, biopsy - corpus luteal cyst
10/17/03
- preoperative diagnoses: dysfunctional uterine bleeding; dysmenorrhea; dyspareunia; pelvic pain
- postoperative diagnoses: dysfunctional uterine bleeding; dysmenorrhea; dyspareunia; pelvic pain; fibroid uterus; vascular adhesions, left lube; cyst right ovary
11/8/04
- mammogram screening
- final assessment: benign mamographic findings
2/5/05
- chief complaint: chest pain, neck pain; pain in shoulders and hips

**Medical Notes, MedPlus Health Care, 3/22/02 - 6/6/05 (Tr. 300-19)**
3/22/02
- complaint: balance problems
- primary diagnosis: fibromyalgia
- secondary diagnosis: Meniere's Disease
5/2/02
- complaint: tired, not sleeping
- primary diagnosis: fibromyalgia, insomnia
- secondary diagnosis: depression
5/16/02
- complaint: scheduled visit for follow-up; feels slightly better
- primary diagnosis: fibromyalgia
- secondary diagnosis: insomnia/ depression
7/17/02
- complaint: hearing problems and muscle spasms; wants to take LOA from work
- primary diagnosis: PTSD
- secondary diagnosis: fibromyalgia
- plan: placed on Zanaflex
10/15/02
- complaint: achy all over; nausea; headaches
- primary diagnosis: URI
- secondary diagnosis:  headache; nausea
10/21/02
- complaint: still sick in stomach; diarrhea
- primary diagnosis: CFS; Meniere's Disease
- secondary diagnosis: fibromyalgia; PTSD; illegible
11/3/03
- complaint: follow-up on chronic fatigue
- objective: looks good
- primary diagnosis: Meniere's; RFS; fibromyalgia

- secondary diagnosis: PTSD
<u>6/6/05</u>
- refill prescriptions


**<u>Treatment Notes, University Health Associates, 9/20/01 - 2/25/03 (Tr. 171-75 & 397-401)</u>**
<u>9/20/01 Outpatient History and Physical Exam</u>
- subjective: dizziness
- assessment: dizziness
- plan: repeat MRI
<u>12/10/01 Progress Note</u>
- complaints: depressed; PTSD; dizziness
- assessment: PTSD; MRI
<u>3/5/02 Progress Note</u>
- assessment: joint pain and positive ANA; ANA insignificant; may have a component of
fibromyalgia but pain is more regional in neck and shoulder area; foot pain; appears to have
carpal tunnel syndrome
- plan: check labs; gave cockup wrist splints for carpal tunnel syndrome
<u>Consultation 2/6/03</u>
- main complaints: pain in dorsal aspect of hand, pain in area of thumb, and numbness in ulnar
aspect of hand
- physical exam: numbness in area of small and right fingers of right upper extremity; no Tinel's
sign at the wrist but had some shocks with tapping of her ulnar nerve at the elbow; grip intact; no
evidence of motor weakness
- assessment and plan: symptoms of ulnar nerve compression of right upper extremity; put
pillows in the area of antecubital fossa at night so she cannot hyperflex her elbow; obtain
EMG/nerve conduction to look for right ulnar nerve compression
<u>Electromyogram Report 2/19/03</u>
- impression: evidence of mild right carpal tunnel syndrome; no definite evidence of right ulnar
neuropathy or right cervical radiculopathy seen
<u>Evaluation 2/25/03</u>
- complaint: right hand pain; symptoms sound like ulnar neuropathy
- test results: show mild right carpal tunnel syndrome; no evidence of right ulnar neuropathy or
right cervical radiculopathy
- physical exam: positive Phalen's test and positive elbow flexion test
- assessment: script for carpal tunnel splint


**<u>Medical Records, MedPlus Health Care, 1/19/04 - 12/14/04 (Tr. 183-210)</u>**
<u>1/24/04</u>
- subjective: sinus infection, swollen glands; no discharge; headaches
- objective: mild tenderness in occipital area of head, more so on left; spasmed cervical and
scalenus muscle; mildly spasmed left trap muscle; ROM of neck is good; TM's are retracted;
clear lungs; regular heart
- plan: given Z-pack; return if symptoms not gone
<u>5/4/04</u>

- objective: looks good; regular heart; cervix is mildly friable, no cervical motion tenderness; extremely tight, tender traps; decreased ROM of neck
- assessment: Meniere's disease; fibromyalgia versus rheumatoid disorder; PTSD; dyslipidemia; hypertension; wart on right hand; possible exposure to sexually transmitted diseases; multiple irritated skin tags; history of migraines, which is stable
- plan: refer to physical therapy for cervical traction; schedule mammogram
7/27/04
- needed certification of healthcare provider filled out for Aegis employment
- suffers from chronic fatigue syndrome, fibromyalgia, PTSD, and Meniere's Disease
9/8/04
- subjective: suffers from chronic fatigue syndrome, fibromyalgia, and questionable lupus; high ANA titers; has myalgias, PTSD, and Meniere's Disease; generalized malaise and muscle and joint aches
- objective: no adenopathy; no thrymegaly; lungs clear; heart regular
- plan: more lab work needed; refilled Xanax
9/22/04
- objective: appears fatigued; heart is regular; lungs are clear
- assessment: systemic lupus versus rheumatoid disorder; chronic fatigue syndrome; fibromyalgia; possible common variable immune deficiency; allergic rhinitis; Meniere's Disease secondary to head trauma
- plan: get immunoglobulins and RAST/MIA
9/29/04
- got certification of Health Care Provider for Aegis done
- has chronic fatigue, mild PSD, and Meniere's Disease
12/14/04
- subjective: recently fired from Aegis for missing work; high ANA titers; questionable lupus versus fibromyalgia; suffers from symptoms of MS; spacial vision, weakness, drops things, extremely clumsy; extremely fatigued, which could be due to rheumatoid disorder; Meniere's Disease; not getting better; falling a lot because of numbness in left leg
- objective: no adenopathy; no thyromegaly; lungs are clear; heart is regular
- plan: get another MRI of brain


**Treatment Notes, Susan Capelle, MD, 10/14/04 - 11/24/04 (Tr. 176-82)**
10/14/04
- chief complaint: bleeding problems and PMB
- diagnosis: enlarged uterus; menses, AUB/DUB; post-menopausal bleeding
- diagnostic tests: CBC; pelvic ultrasound
- plan: heavy vaginal bleeding with confusing history of supposed menopause at 38; received depo-provera and bleeding has slowed; schedule pelvic ultrasound
11/17/04 - ultrasound performed on 11/16
- interpretation:
        - uterus: enlarged leiomyomatous uterus
        - endometrium: normal
        - left ovary: normal

- right ovary: normal
    - cul de sac: no evidence of free fluid
    - cervix: prominent nabothian cysts seen
- impression: enlarged leiomyomatous uterus, with posterior myoma; otherwise normal pelvic ultrasound
- recommendations: EMBx to r/o malignancy. Hyperplasia unlikely to be identified
11/18/04 endometrial biopsy
- diagnosis: abnormal uterine bleeding
- plan: endo biopsy
- final diagnosis: weakly proliferative endometrium with tubal metaplasia and eosinophilic cell changes; negative for malignancy

**Physical Residual Functional Capacity Assessment, 2/16/05 (Tr. 138-145)**
primary diagnosis: fibromyalgia
exertional limitations: none
postural limitations: none
manipulative limitations: none
visual limitations: none
communicative limitations: none
environmental limitations: none
symptoms: not credible - physical findings do not support allegations

**Psychiatric Review Technique, Dr. Suansilppongse, 3/4/05 (Tr. 230-43)**
- medical disposition:
    - impairments not severe
    - coexisting nonmental impairments that require referral to another medical specialty
- categories upon which the medical disposition is based:
    - 12.06 anxiety-related disorders - alleged PTSD, anxiety and depressive reaction; pain
- functions:
    - restriction of activities of daily living: mild
    - difficulties in maintaining social functioning: mild
    - difficulties in maintaining concentration, persistence, or pace: mild
    - episodes of decompensation, each of extended duration: insufficient evidence
- evidence does not establish the presence of "C" criterion
- notes: file contains no formal mental health report; mental condition seems to be stable with treatment; activities of daily living are largely limited due to her alleged physical restrictions; allegations of Claimant are partially credible

**Psychological Evaluation, Dr. Pearse, 5/11/05 & 8/22/05 (Tr. 244-50)**
- claimant's allegations: PTSD, Meniere's Disease, fibromyalgia, fatigue; muscle disorder and arthritis
- mental status examination: positive attitude; cooperative; good eye contact; adequate length of verbal responses; sense of humor; spontaneous; relevant speech; oriented x4; depressed mood; restricted affect; no evidence of disturbance of thought process, thought content, or perception;

insight within normal limits; suicidal ideation with no intent; homicidal ideation with plan and intent but no plan to follow through; immediate memory was mildly deficient and recent memory was within normal limits; concentration was moderately deficient

- WASI Assessment:
      - verbal IQ:            98
      - performance IQ:    93
      - full scale IQ:      96
      - vocabulary:        8
      - similarities:        12
      - block design:     9
      - matrix reasoning:  8

- MMPI-2 Diagnostic Impressions:
      - Axis I:      296.52 - bipolar disorder - I, most recent episode depressed
                     305.0 - alcohol abuse in total sustained remission
                     305.7 - amphetamine abuse in total sustained remission
                     305.5 - opioid abuse (codeine) in total sustained remission
      - Axis II:     obsessive-compulsive disorder
      - Axis III:    fibromyalgia and Meniere's Disease from client report
      - Axis IV:    problems with primary support group
      - Axis V:     GAF 60

- Summary and Recommendations: according to client, two chronic illnesses, fibromyalgia, and Meniere's Disease. Evaluation indicates a chronic mental illness.

**Routine Abstract Form Mental, Dr. Pearse, 7/21/05 (Tr. 251-56)**

- claimant's allegations: PTSD, Meniere's Disease, Fibromyalgia, fatigue, muscle disorder, arthritis
- mental status examination:
      - oriented X3
      - speech - normal
      - delusions, hallucinations, suicidal/ homicidal ideation: none
      - judgment: mildly deficient
      - affect: broad
      - mood: irritable, angry
      - perceptual: normal
      - insight: moderately deficient
      - thought content: normal
      - psychomotor activity: fidgety
      - immediate memory: normal
      - recent memory: normal
      - social functioning: moderately deficient
      - concentration: normal
      - task persistence: normal
      - pace: normal
- DSM-IV criteria

       - Axis I: 300
       - Axis II: V71.09
       - Axis III: fibromyalgia, Meniere's Disease, chronic fatigue
       - Axis IV: relationship and financial problems
       - Axis V: 60
- notes: in counseling to reduce anxiety and elevate depressed mood.  No indication of memory, understanding, and persistence lacking

**Psychiatric Review Technique, George Allen, Ph.D., 12/29/05 (Tr. 257-70)**
- medical disposition:
       - impairments not severe
- categories upon which the medical disposition is based:
       - 12.04 Affective Disorders - Bipolar I - most recent depressed
       - 12.08 Personality Disorders - OCD personality
- functions:
       - restriction of activities of daily living: none
       - difficulties in maintaining social functioning: mild
       - difficulties in maintaining concentration, persistence, or pace: mild
       - episodes of decompensation, each of extended duration: none
- notes: Claimant partially credible; memory complaints more extreme than objective findings

**Physical Residual Functional Capacity Assessment, Dr. Osborne, 1/10/06 (Tr. 271-79)**
- primary diagnosis: fibromyalgia
- secondary diagnosis: Meniere's Disease
Exertional Limitations
- occasionally lift: 50 pounds
- frequently lift: 25 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry
Postural Limitations
- climbing ramp/stairs: frequently
- climbing ladder/rope/scaffolds: never
- balancing: occasionally
- stooping: frequently
- kneeling: frequently
- crouching: frequently
- crawling: frequently
Manipulative Limitations: none
Visual Limitations: none
Communicative Limitations: none
Environmental Limitations:
- extreme cold: unlimited

- extreme heat: unlimited
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: unlimited
- fumes, odors, dusts, gases, poor ventilation: unlimited
- hazards: avoid concentrated exposure
<u>Symptoms</u>: seen regularly for psych problems; partially credible to support decreasing RFC to medium

**<u>Medical Records, VAMC, 6/5/06 - 8/14/07 (Tr. 320-96 & 407-27)</u>**
<u>6/5/06 ECG Report</u>
- normal sinus rhythm; right superior axis deviation; abnormal ECG
<u>6/5/06 Progress Note</u>
- subjective: medical leave since 2004 for fibromyalgia; during past month, claimant feeling down, depressed, and hopeless; little interest in doing things; no alcohol used in past 12 months; smokes 1 pack/day; currently uses chewing tobacco
- PMH: muscle spasms in legs; ?fibromyalgia; ?MS; balance problems; ?Meniere's Disease vs. brain stem problem; shoulder, hips, knee pain; migraine headaches; seasonal allergies; tinnitis; diarrhea; chest pain; h/o melanoma on L side of neck; h/o abnormal uterine bleeding
- assessment/plan:
	- muscle spasms in legs, ?fibromyalgia, ?MS
	- balance problems, ?Meniere's h/o head trauma in the past
	- shoulder, hips, knee pain - continue naproxen
	- migraine headaches, use maxalt
	- seasonal allergies
	- tinnitis
	- diarrhea
	- chest pain - will order EKG and outpt stress test for follow-up
	- h/o melanoma
	- h/o abnormal uterine bleeding - consult to gyn
	- PTSD - consult mhc
	- HTN - continue hctz and K+
	- trc in 1 month for fasting labs or sooner prn
<u>6/12/06 Progress Note</u>
- complaints: questions regarding diagnostic testing
- disposition: explanation given
<u>6/13/06 Weight Management Evaluation</u>
- behavioral summary: moderately dissatisfied with appearance of her body
- reasons for overweight/obesity: emotions/stress; family and relationship problems; not enough physical activity; difficulty with self-control; pleasure
<u>6/13/06 Gynecology Consult</u>
- subjective: initial gynecological evaluation; irregularity of cycles and associated dysmenorrhea with heavy flow; no problems with bladder, bowel, or breast; smoker

- objective: obese; normal
- assessment: annual gynecologic examination; pap smear of the cervix; bronchitis - resolving; irregular cycle; fibrocystic changes of breast
- plan: mamogram ordered; cycle on medroxyprogesterone

<u>6/15/06 Radiology Report - Myocardial Perfusion</u>
- findings: perfusion findings show small perfusion defect at rest and stress in apex; remainder of myocardial walls showed normal perfusion at rest and stress
- impression: probably normal exam; small perfusion defect at rest and stress in apex; no ischemia; normal left ventricular function

<u>6/26/06 Assessment</u>
- chief complaint: nervous and anxious; easily frustrated
- mental status exam: alert and oriented to person, place, time, and situation; cooperative; speech is clear, coherent, productive, with good comprehension, euthymic mood and affect; thought process and content intact; memory intact for past and present events; able to do simple calculation; answered appropriately to similarity and judgment questions
- assessment and plan:
  - Axis I:    rule out bipolar II - very likely by history.
             Chronic PTSD with residual symptoms, secondary to childhood sexual trauma
             Nicotine dependence
             Past history of alcohol dependence
  - Axis II:   deferred
  - Axis III:  hypertension; myalgia; status post three C-sections and septoplasty
  - Axis IV:   unemployment and minor problems in the primary family
  - Axis V:    GAF 60, moderate impairment
- treatment plan: stay on medications

<u>7/12/06 ECG Report</u>
- normal sinus rhythm; nonspecific T wave abnormality; abnormal ECG
- no significant change found from 6/5/06

<u>7/14/06 Progress Note</u>
- subjective: chest pain episodes 2-3 times/week associated with shortness of breath with radiating pain to bilateral upper extremities, neck and left jaw; feeling of rapid heart rate, palpitations, chills and tingling that radiates to arms and face
- objective: stress test negative for chest pain but positive for nonspecific ST-T changes but negative for ischemia; vital signs stable; alert and oriented
- assessment/plan:
  - chest pain of uncertain etiology - positive risk factors and equivocal stress testing - consult with cardiology for follow-up
  - history of muscle spasms in legs - questionable fibromyalgia versus ?MS
  - balance problems - questionable Meniere's Disease; head trauma in past
  - shoulders, hips and knee pain - stable on naproxen
  - migraine headaches
  - seasonal allergies
  - tinnitus

- diarrhea - likely IBS
- history of melanoma on left side of neck
- history of abnormal urine bleeding - seen by GYN
- PTSD - seen by Mental Health
- hypertension - continue medications
- hyperlipidemia
- return to clinic

7/31/06 Cardiology Consult
- chief complaint: chest pain; some stomach pain especially with fried foods
- physical exam: lungs are clear; heart is regular
- impression: atypical chest pain, doubt cardiac origin; negative stress EKG; no ischemia
- recommendations: continue current regimen

8/24/06 chest exam
- no consolidation, effusion, or pneumothorax identified; mild increase in interstitial markings
that can be seen with chronic tobacco abuse; straightening of left heart border; cardiomediastinal
silhouette is otherwise unremarkable
- impression: no acute process identified

9/16/06 Gynecology Clinic Note
- subjective: pap smears returned unsatisfactory because of scan cellularity
- assessment: recurrent unsat; pap, scanr cellularity; probable nabothian cyst
- plan: call for result

10/4/06 Pathology Report
- very minute fragment of squamous type epithelium; focal slight disarray of squamous type
epithelial cells

10/4/06 Psychiatry Note
- subjective: not getting enough sleep; doing well on medications
- mental status exam: presented and interacted well; good range of affect; no exhibiting any
suicidal or homicidal ideation; mental status intact
- diagnoses:
  - Axis I:    Chronic PTSD with residual symptoms secondary to childhood sexual
               trauma; rule out bipolar II - very likely by history, needs further
               observation to confirm; alcohol dependence in full, sustained recovery;
               nicotine dependence
  - Axis V:    GAF 60 to 65, moderate impairment
- treatment plan: continue medications; avoid Xanax; use relaxation; cut down on tobacco

10/16/06 Primary Care Visit
- subjective: chest pain and epigastric pain - occasionally associated with meals
- assessment/plan:
  - chest pain - seen by cardiology - likely non-cardiac; order GB u/s and upper GI
  - history of muscle spasm in legs - questionable fibromyalgia vs. ?MS
  - balance problems - questionable Meniere's Disease and has had head trauma in past -
  MRI of brain was normal
  - shoulders, hips and knee pain - stable on tylenol, rarely uses naproxen
  - migraines

- seasonal allergies
- tinnitus
- diarrhea - likely IBS
- history of melanoma on left side of neck
- history of abnormal urine bleeding - seen by GYN
- PTSD - seen by mental health
- hypertension - continue supplements
- hyperlipidemia - increase medications

11/8/06 Abdomen Ultrasound
- report: ultrasound of right upper quadrant - gallbladder echo-free; liver is normal without intrahepatic biliary duct dilatation; right kidney is normal; pancreas is normal
- impression: normal ultrasound of right upper quadrant

11/13/06 Ultrasound
- report: ultrasound of right upper quadrant
- gallbladder is echo-free; liver is normal; no dilatation of the CBD; right kidney is normal in size and shape; pancreas is unremarkable
- impression: normal ultrasound of right upper quadrant
- primary diagnostic code: normal
- report: upper GI series and small bowel follow-through performed
- extensive reflux to proximal esophagus; no hiatal hernia observed; stomach demonstrates normal distensibility, morphology and rugal folds; no evidence for ulceration; duodenal bulb and duodenal c-loop are unremarkable; normal mucosal fold pattern of jejunum and ileum; no persistent stricture and no dilatation; terminal ileum is well visualized and is unremarkable; proximal colon is normal
- impression: extensive reflux to proximal esophagus; upper GI and small bowel follow-through is unremarkable

1/9/07 Psychiatry Note
- subjective: stressed; very likely she suffers from bipolar II along with PTSD secondary to childhood sexual trauma
- objective: presented and interacted well; good range of affect; not exhibiting any suicidal or homicidal ideation; mental status is intact
- diagnoses:
  - Axis I        chronic PTSD with residual symptoms secondary to childhood sexual trauma; bipolar II - provisional diagnosis; alcohol dependence, in full sustained recovery; nicotine dependence, has cut down, but not able to quit
  - Axis V        GAF 60 to 65, moderate impairment
- treatment plan: same medications; encouraged to exercise regularly and follow sleep hygiene

1/22/07 Primary Care Visit
- subjective: follow-up; doing much better; stomach pain is significantly improved; muscle cramps at night
- assessment/plan:
  - chest pain - seen by cardiology likely non-cardiac; upper GI showing extensive reflux
  - history of muscle spasms in legs, questionable fibromyalgia vs. ?MS

- balance problems - questionable Meniere's Disease and has had head trauma in past; MRI of brain was normal
- shoulders, hips and knee pain - stable on tylenol
- migraine headaches
- seasonal allergies
- tinnitus
- diarrhea - likely IBS
- history of melanoma on left side of neck
- history of abnormal urine bleeding - seen by GYN
- PTSD - seen by mental health
- hypertension - continue supplements
- hyperlipidemia - continue zocor
- GERD - continue medication

<u>4/13/07 Psychiatry Note</u>
- subjective: very likely she still suffers from bipolar II along with PTSD, secondary to childhood sexual trauma; going to take herbal medication
- objective: presented and interacted well; good range of affect; not exhibiting any suicidal or homicidal ideation; mental status is intact
- assessment and plan:
- Axis I     chronic PTSD with residual symptoms, secondary to childhood sexual trauma; bipolar II, by history; alcohol dependence in full sustained recovery; nicotine dependence
- Axis V    GAF 60 to 65, moderate impairment
- treatment plan: continue medications; encouraged to exercise regularly and follow sleep hygiene

<u>7/20/07 Primary Care Visit</u>
- subjective: no acute problems today; more muscle spasms in low back
- assessment/plan:
- chest pain - seen by cardiology likely non-cardiac; upper GI showing extensive reflux
- history of muscle spasms in legs, questionable fibromyalgia vs. ?MS
- balance problems - questionable Meniere's Disease and has had head trauma in past; MRI of brain was normal
- shoulders, hips and knee pain - stable on tylenol
- migraine headaches
- seasonal allergies
- tinnitus
- diarrhea - likely IBS
- history of melanoma on left side of neck
- history of abnormal urine bleeding - seen by GYN
- PTSD - seen by mental health
- hypertension - continue supplements
- hyperlipidemia - continue zocor
- GERD - continue medication

<u>8/14/07 Assessment</u>

- subjective: struggles with chronic PTSD by childhood sexual trauma; past history of alcohol dependence, now in full sustained recovery
- objective: presented relaxed; interacted and communicated well; good range of affect; not exhibiting any pressure of speech or tangentiality; no exhibiting any suicidal or homicidal ideation; mental status is intact
- assessment/plan:
    - Axis I       chronic PTSD with residual symptoms, secondary to childhood sexual trauma; alcohol dependence in full sustained recovery; rule out bipolar II - needs further observatioin; nicotine dependence - struggling to quit
    - Axis V      GAF mood wise 60 to 65, moderate impairment
- treatment plan: continue medications

**Medical Assessment of Ability to do Work-Related Activities (Mental), 8/24/07 (Tr. 404-06)**
making occupational adjustments
- follow work rules: good
- relate to co-workers: fair
- deal with public: fair
- use judgment: fair
- interact with supervisors: fair
- deal with work stresses: poor
- functioning independently: good
- maintain attention/ concentration: fair
making performance adjustments
- understand, remember, and carry out complex job instructions: fair
- understand, remember, and carry out detailed, but not complex job instructions: good
- understand, remember, and carry out simple job instructions: good
making personal-social adjustments
- maintain personal appearance: good
- behave in an emotionally stable manner: fair
- relate predictability in social situations: fair
- demonstrates reliability: fair
capability to manage benefits: yes

D.    Testimonial Evidence

       Testimony was taken at the hearing held on April 6, 2007. The following portions of the

testimony are relevant to the disposition of the case:

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

    Q     Now, Mrs. Anderson, do you currently live at 200 Spence Street in Fairmont?
    A     Yes, Sir.
    Q     And your birthday is June 28th, '60?

A       Yes, Sir.

Q       And you're married, correct?

A       Yes, Sir.

Q       And any children living at home?

A       No, Sir.

Q       And how far did you go in school?

A       I have one year of post-graduate work.

Q       And where did you go to college?

A       Undergraduate at Fairmont State and postgraduate work at WDU.

Q       And what, what was your degree in?

A       Degree was in psychology.

Q       BA, BS?

A       BA.

Q       And when was that?

A       I graduated in 1999.

Q       And what was your graduate work in?

A       Social work.

Q       Did you complete any graduate degree?

A       No, Sir.

Q       Okay.  And why was that?

A       I became ill, my balance got worse, I got lost a couple of times at the college, I missed my bus home.

                        *               *               *

A       I got stuck in Morgantown a couple times.

Q       Hum.  Ever have any other vocational training other than your college and graduate school?

A       No, Sir.

Q       Ever in the military?

A       No.

                        *               *               *

Q       Okay.  Now you have VA treatment records, so is that because your husband is, was a veteran or what - -

A       Yes, Sir.

Q       - - why, how did you wind up getting VA treatment?

A       Yes, Sir, through my husband, he's a veteran and under the Champus.

                        *               *               *

Q       Oh, okay.  Now you indicate you haven't been able to work since around October of '04.  What's been the main problem with your ability to work since then?

A       It's, it's kind of difficult to explain.  The main problem has always been my balance.

Q       Um-hum.

A       And stress makes the balance worse and makes the pain worse from the muscle spasms and the fibromyalgia and the PTSD.  Basically it's all of it put together and the balance is the main thing.  I'm afraid of falling.

Q      Okay.

A      I have trouble concentrating.

Q      Well, why, why do you have a balance problem?

A      I had a hear injury when I was young child and then I had a stepfather that for 12 years was extremely abusive.  I was repeatedly hit in the head and then from '85 to '89 I was married to an extremely abusive man and received a lot of hits in the head.

Q      Okay.  When did this start?

A      The balance problem itself started in '83.

Q      And the - - did they diagnose it as anything in particular or - -

A      Basically it was given a general diagnosis of vertigo at the time - -

Q      Um-hum.

A      - - and several different treatment options I went through.

Q      What kind of treatment did you have?

A      I had allergy shots that didn't work, I had my nerves operated on.  They thought if they cleared the airway passage where it had been broke so many times that would work.

Q      Hum.

A      That didn't work.  I went through rehabilitation to learn how to do things like grocery shopping because visual, visual input, a lot of that is - - makes the balance worse.

Q      Um-hum.

A      Learn how to use shadows to judge for depth perception, basically how to manage it when your balance is messed up.

Q      Um-hum.

A      And then it just gradually over the years has gotten worse.

Q      The, the balance has - -

A      Yes.

Q      And, and do you know why that is?  I mean have the doctors said why that is?

A      No.

Q      Are you getting any treatment now for this?

A      I take medication.

Q      And that's the Antivert?

A      Yes.

Q      Does that relieve the problem?

A      It works as well as anything will work.  It's basically the only thing they tell me that there is for it.

Q      Well, does the problem go away when you take the Antivert?

A      No, Sir, the problem never goes away, it just gets better.

Q      Okay.  And how often do you have this problem, is it constant?

A      I have it all the time - -

Q      Um-hum.

A      - - everything feels like it's moving, even when I'm sitting down it feels like the floor under me is moving or the chair is moving.

Q      Okay.

A      Then there are periods where I'm just a little bit off and I walk into doors and things.  I have bruises all the time.

Q      Um-hum.

A      Then there are times when I can be walking and it just feels like there's a hole in the floor.

Q      Hum.

A      And I'll just fall, and then there's the time when I don't get up at all because to sit up just - - things start to spin and I get very sick at my stomach and I just lay down.

Q      Um-hum.  How much of the day do you spend laying down?

A      Probably off and on about 35, 40 percent of the day.

Q      Um-hum.  Now you were working up until '04 at - - well, you were working - - was this a telecommunications place?

A      Yes, Sir.

Q      And what were you doing there?  Was that IQI?

A      No, it's called Aegis Communications.

Q      Aegis, oh, Aegis.

A      I think it was   IQI at one time, maybe that's still the parent company.  We never could figure it out.

Q      Well, your, your earnings are listed as coming from IQI.

A      Yeah, that must be the parent company.

Q      And that, that goes back to, it goes - - IQ - - your earnings go back in IQI to '98.

A      Yes, Sir, I worked there from '98 to '99, then I had to take a year off and then I went back in August of 2000 and worked until '04.

Q      And why did you take a year off?

A      My balance became worse once again.

Q      In - - what happened in 2000 that caused your balance to, to get worse?

A      Not 2000, Sir, in '99.

Q      Oh, I thought you said you took a year off in 2000, okay.

A      No, I'm sorry.

Q      That's okay, I'm probably, I probably misspoke.  What happened in 1999 that - -

A      I don't know what causes it.

Q      Um-hum.

A      If I knew what caused it I wouldn't let it happen.  It just - - stress, they just tell me it's going to progressively get worse.

Q      Um-hum.  And then - - well, what happened in 2004?  I mean how - - because you went back to work at the same place and what was going on it the last few months of 2004?

A      The, the fibromyalgia had started kicking in, I'd taken several things of prednisone, it wasn't helping.  The muscle spasms became a lot worse.  The stress level at work was just - - to me it was unbelievable.  I couldn't - - I was screwing up orders, I wasn't completing a full week of work.

Q      How much were you missing?

A      I probably worked - - I'm not real good with memory, that's another problem with it.  But I would say maybe three and a half days a week toward the end.

Q      Um-hum, and why was that?

A      Just couldn't get out of bed, couldn't stand to sit.  I was in too much pain to concentrate and the medication that I have - - had to take you can't remember things.  You can't

put up a couple thousand phone lines and without messing up orders.

Q        Okay.  Now what were you actually doing at Aegis or IQI?

A        For the last two years there - -

Q        Um-hum.

A        - - I did the long distance ordering of lines for Microsoft, McDonalds and New York Times, Boston Globe.

Q        Okay.  What do you mean ordering lines?

A        Okay.  For an example say the Democratic National Convention.  When they had the Democratic National Convention they needed phone lines for all the press that were there for the New York Times, Boston Globe Association and we had to put up between I think two, two to 3,000 lines.  So I had to contact the local carrier, they had to actually create fake telephone numbers, just temporary telephone numbers.  Then I had to hook them up with long distance service and data lines and coordinate that with the person that did the data lines for video conferencing so they could basically use their fax machines, computers and stuff like that.

Q        Um-hum.

A        Then basically your local service is handled by your local company and your long distance service is handled by your long distance company.

Q        Right.

A        So when a new company would start up or shut down in one of those organizations they would call me and I would either take down lines or put up lines.

Q        For the company?

A        For the different companies, yeah.

                                *                *                *

Q        Um-hum, okay.  And how much did you have - - what's the most you had to lift doing this job your last couple years?

A        Well, we had to keep our books on the floor so five to seven pounds.

Q        What books?

A        We had huge, thick binders like this.

Q        Um-hum.

A        The big three-ring binders.

                                *                *                *

Q        And then were you pretty much sitting all day at a computer or phone line?

A        Yes, Sir.

Q        Okay.  And then did they ask you to leave or did you quit or what happened?

A        Well, when I went on intermittent leave in 2002 - -

Q        Um-hum.

A        - - under the FMLA Act and Aegis is not happy with things like that, or IQI, and then I just started missing more and more.  I didn't have enough paid time off to cover the times that I was out.

Q        Um-hum.

A        And I couldn't keep up.  I missed so much work that I couldn't keep up with what I had to do by the time I got back because you handle your own clients.

                                *                *                *

Q        Um-hum.  So, so you were, you were actually starting to miss work in '02 and

20

'03, not just '04?

A  Right.  So it just escalated in '04.

Q  Um-hum.  Now what were you doing for IQI before - - you know, from '98 and '99 initially?

A  '98 and '99 it was strictly telemarketing, trying to sell people applications for credit cards.

Q  So that was the usual telemarketer job where you - -

A  Yeah.

Q  - - basically - -

A  Hi, my name is Billy, how are you today?

Q  You're lifting basically nothing - -

A  Nothing.

Q  - - and you're sitting at a, you're sitting at a computer with a headset on and - -

A  Um-hum.

Q  - - you know, typing something on the computer or - -

A  Yeah.

Q  - - and that's doing that all day long?

A  All day long, yes, Sir.

Q  Um-hum, okay.  Have you ever done any other work other than those two jobs in the last 15 years?

A  I worked at - -

Q  You have it listed as Go-Mart.

A  Yeah, I worked there.

Q  In '96 and '97 and '98, what was that?

A  I was a clerk.

Q  Oh, okay.  And then we have a, some brief work at Task Force on Domestic Violence but it looks like it didn't last too long.

A  No, sir.

Q  And then there's a - - in 2002 there's a tiny bit of income from Prudential Insurance but was that a job or was that some kind of disability insurance?

A  I have no idea.

Q  Prudential Insurance Company out of Iselin, New Jersey, it was 200, basically $250.

A  So that was my, my 401K that I cashed out.

Q  Oh, okay.  Okay, well, that, that - - yeah, oh, that - -

A  I forgot all about that.

Q  No, that's okay, that's no problem.  Do you - - now what kind of problems do you have from the fibromyalgia?

A  Pain, stiffness.

Q  And where is the pain located?

A  In the hips, the knees, through the shoulders, the neck.

Q  And is this constant or does it come and go?

A  It comes and goes.  It seems to be coming a lot more than it's going.

Q  And what makes it worse or what makes it come out?

A      Stress, cold, a lot of physical exertion, sitting for long periods of time, walking for long periods - - basically any - - doing the same thing for a long amount of time.

Q      And then how far can you normally walk at a stretch say on a level surface like at a store or something?

A      Well, I usually do a couple aisles and then stop and go into Subway, get a drink, come back out, do a couple more aisles. It depends upon the day.

Q      How about just standing like at home like where you're standing like around a sink or stove or something, how long can you stand at a stretch?

A      Ten, 15 minutes.

Q      And how about sitting and how long can you sit before you'd have to get up and move around?

A      About 15 or 20 minutes. Can I - -

Q      Yeah.

A      - - a little bit now?

Q      Sure, you, you don't need to ask, you can, you can stand up or sit down or move around, whatever you want. Just try to aim your voice at the microphone. Now do you have any problems with your hands or fingers?

A      They hurt.

Q      Well, are you getting any treatment for anything?

A      No, Sir. Right now the VA, what they cover under Champ is basically medicine, so my doctor does what she can, what she's allowed to under their guidelines.

Q      Hum.

A      But you can't see a lot of specialists.

Q      Uh-huh.

A      You know, like I can't see a rheumatologist, I can't see a neurologist.

                         *                *              *

Q      Okay. So what did they do for your hands?

A      Just they give me more medication.

Q      Can you hold a cup of coffee or glass of milk okay?

A      With both hands.

Q      For example, use a knife and for together, like cut meats?

A      Yes.

Q      And what's the most you can lift now? And when I say lift I don't mean bend over to the floor and pick up off the floor, but if you're sitting or standing at a table like, like the one you're at, how much do you think you could pick up and say move to a refrigerator or move to another table or something like that?

A      Four or five pounds.

Q      What would happen if you went over that?

A      It would hurt.

Q      Okay.

A      And I would probably drop it.

Q      Now have you had any treatment for the fibromyalgia?

A      The - - I take Naproxen to help with the pain and when it gets really, really bad

they usually prescribe prednisone.  But that's almost worse than the fibromyalgia.

Q      How often do you take prednisone for this?

A      I try to limit it to every six months.  I mean when I absolutely, positively am crying in pain is when I will do the prednisone.

Q      And then how long do you take that for?

A      You take it for 10 days.

Q      And do these work?

A      It gets rid of the pain but the side effects of the prednisone are - - I don't know if you've ever taken it but your heart beat goes up to like 120 to 140 beats a minute.  Your eyeballs actually feel like they're pulsing out of your head.  I have acid reflux so then my stomach's upset for days after taking it.  It's nasty stuff, it just really is.

Q      And do you have any side effects from of your other medicines you take?

A      Yes, sir, all of them.

Q      Like what?

A      I take - - the Antivert makes your mouth really dry and, of course, it makes you sleepy, which interferes with your concentration.  The hydrochlorothiazide, which is to keep the fluid down in the ears to help with the balance and that also helps with the fibromyalgia - -

Q      I'm sorry, what did - - you said this for to keep the fluid down for the balance and what?

A      It helps with the fibromyalgia.  You don't have that extra pressure.

Q      Okay.

A      And it causes your - - it removes your electrolytes from your body, so for that I take the potassium, which makes you sick at your stomach.  And I take it's called Mag-Ox, it's basically a strong magnesium supplement.  Let's see, the Naproxen is really bad for your stomach so that burns, hurts your stomach, makes it hurt.  All the antidepressants, all of those have side effects.  The latest one, the Topamax, makes your eyes really, really dry, so then I have to take eye drops, blurred vision, so it's hard to read, watch TV.

Q      What's that from, do you know?

A      The Topamax.

                        *                    *                    *

Q      Well, you take Bupropion for depression, as well as Topamax and - - well, that's all you have listed for, for that.

A      Oh, there's one that I take at night - -

Q      Oh, Mirtazapine for sleep?

A      Yes.

Q      Hum.  What, what is that, do you know what that is?

A      It's actually an antidepressant.

Q      Is it like trazodone or amitriptyline - - well, no, it wouldn't be amitriptyline.

A      No.  I don't know what it's - -

Q      Well, a common one that they prescribe for sleep is trazodone but there, there are some others that are, you know, sometimes used also for antidepressants.  Do these help with depression?

A      Somewhat.

Q      Okay.  What kind of problems do you have from depression or anxiety or PTSD?

A      I'm terrified to go anywhere by myself.  I haven't been anywhere by myself in at least two years.

Q      Um-hum.

A      I have suicidal thoughts, that's why she added the last antidepressant.

Q      And that's the Topamax is it?

A      Yeah.   I just really don't want to do anything and that causes friction between me and my husband, me and my children.

*        *        *

Q      Are you getting any treatment for depression other than the medicines?

A      I see a psychiatrist, but once again the VA offers counseling for PTSD but it's all for men and my problem is with men, so the counseling they have up there doesn't help me.

Q      Um-hum.   How often do you see the psychiatrist?

A      I see her every 90 days.

Q      And who, who is that?

A      I call her Dr. K but her name's - -

ATTY      It's Kurapati (Phonetic).

CLMT      Kurapati.

BY ADMINISTRATIVE LAW JUDGE:

Q      Okay, and where is that?

A      The VA.

Q      In Clarksburg?

A      Yes.

*        *        *

Q      What, what makes your depression or PTSD worse?  You said being out by yourself, anything else?

A      Hearing any kind of argument, I just, I can't stand it.  People even just pretend to arguing, you know, bantering backward and forward, anything associated with violence, confusion, certain smells trigger it.  Smells is probably one of the biggest ones with me.

Q      What, what smells cause problems?

A      Mildew.

Q      Um-hum.

A      Basement smells.

Q      Does anything make you feel better or lift your spirits or reduce your anxiety other than the medicines?

A      Sleep.

Q      Um-hum.  Do you have any other conditions that affect your ability to work that we haven't talked about?

A      I'm trying to remember.  We talked about the fibromyalgia, we talked about the depression and we talked about the balance, we talked about the PTSD, the muscle spasms.

Q      And what are they from, why is - - they're probably from the fibromyalgia?

A      Well, they haven't decided yet.  I can't seem to stick - - keep insurance long enough for them to find out.

Q      Where are the spasms?

A      Legs, arms, back, everywhere, neck.

Q        And does the Zanaflex relieve that?

A        To a degree.  It certainly hasn't been working as well lately.

Q        Now you're also taking medication for headache?

A        Yes, that's the muscle spasms and the fibromyalgia tend to lead to migraines because everything tightens up through here.

Q        Um-hum.  How often do you have problems with headaches?

A        The last two months its been just about every day.

Q        Well, how about normally?  Was that, what's sort of an average for headaches?  I mean is - -

A        Once a week.

Q        And how long do they last?

A        All day, until I can get to sleep and sleep it off.

Q        Does any medicine help?

A        The - - it starts with a Z, I don't know what it is.

Q        You got Zolmitriptan or - -

A        Yeah.

Q        Now does it, does that help when you - - if you take it?

A        Yes.

Q        Any side effects from that?

A        Yes, it makes you shaky and it gives you muscle spasms.

Q        Okay.  The, anything cause the headaches to come on or get worse?

A        The weather, when the, the barometric pressure, stress because of the tightening up of the muscles in the neck, a cold, allergies.

Q        Um-hum.  Anything help other than medicine or just going to sleep?

A        Not really.

Q        Okay.  Now how do you spend your time most days?

A        Usually walking around trying to figure out what I'm doing.  I read.

Q        What kind of things do you read?

A        Basically anything.

Q        Like books or magazines and newspapers?

A        No, I don't do magazines and newspapers, I read books.

                    *                    *                    *

Q        What kind of books do you read?

A        I read romance novels, light fiction, historical fiction, science fiction, don't do with non-fiction too much anymore.  I can't keep it in my head, so - -

Q        Um-hum.

A        - - just aggravating.

Q        And do you like get the books from the library or, or just buy them all?

A        Friends give them to me and the VA has an excellent loan out program and usually that's what some of them will give me is a gift because they know that's what I like the most.

Q        Um-hum.  Do you watch TV?

A        Not really big on TV, it's just sitting still for long periods of time is uncomfortable so nobody likes to watch TV with me because I won't sit still long enough.

Q        Do you, does anybody live in your home other than you and your husband?

A        No.

Q        Do you like any of the cooking, cleaning, dishes, laundry for the family?

A        He does most of that.

Q        Do you help out with any of it?

A        Yeah, I do like dusting as long as it's where I can reach it okay.  I break a lot.  I can sweep.  I fold clothes sometimes.

Q        Do you, do you ever cook anything?

A        Mostly I stick with cereal and a lot of microwavable dishes.

Q        Okay.

A        And my husband cooks in quantity and cans it so all I have to do is like open it up and heat it up.

Q        Do you ever do any dishes or anything like that?

A        Now and then I do dishes.  When I, when I feel good I do dishes, when I don't feel good he does dishes and we use paper plates.

Q        Do you get out and go grocery shopping?

A        Not by myself.  I have a friend that goes with me every week.

Q        Can you drive okay?

A        No, sir, I haven't driven since '83.

Q        And why is that?

A        Part of the balance thing is they call it spacial dyslexia and part of it's depth perception.  You're just not sure at any time how close you are to something, how far away you are from something.  And I was involved in an auto accident and even though it was determined that the woman was at fault there was still enough of a doubt in my mind and I had a three-year-old son  - -

Q        Um-hum.

A        - - that I really shouldn't be driving and the neurologist I saw at the time said it probably would be better not to.

Q        Um-hum.  Do you ever get out and go to like a shopping mall for shoes or clothes or anything like that?

A        With my husband or with my friend.

Q        And how often do you do that?

A        Probably once a week, once every two weeks.  Neither one of us is big on crowds, so - -

Q        Do you have any hobbies or anything you still enjoy doing?

A        I like to crochet and quilt.

Q        Do you ever get out and do any like gardening or lawn work around your place?

A        If my husband's there.

Q        And what do you do?

A        Cut the weeds off, the leaves off, pull bugs off, use the hose to Miracle Grow, if stuff's in season, pick it, put it in buckets and he carries it.

Q        But you don't plant it?

A        No.  I don't do real good with plants, they seem to die, I don't know what it is.

*               *               *

Q       Um-hum.  Do you ever get out and visit friends or relations?
A       No.
Q       Do people ever come over to visit you?
A       Not very, not very often.  I'm known as being unsociable.
Q       Have you always been kind of a loner?
A       No, sir, I use to be president of an association in college, I belonged to all kinds of organizations, I volunteered at Hope, Incorporated, I was the emergency counselor on the phone, different organizations I belonged to.  When my kids were in Head Start I was a volunteer mother, use to roller skate, use to go rock climbing, ride bikes, I like to mountain bike.
Q       Um-hum.   How long has it been since you did any of that stuff?
A       Well, the bike riding and all that went out the window in '83.
Q       Um-hum.
A       And the organizations just gradually fell off one by one.
Q       Hum.
A       Probably been three or four years since I was at Hope to do any of that.  I don't belong
to any organizations now.  I use to do tarot card readings and I don't do that anymore.  I use to volunteer that for my like carnivals and stuff to raise money and I haven't done that in a couple years.
Q       Um-hum.  Do you ever get out and go to like a restaurant or movie or church or anything like that?
A       My husband and I go out to eat.
Q       How often do you do that?
A       A lot because he's just learning how to cook, so probably once or twice a week.
Q       Ever go to a movie, church, club, fraternal organization?
A       No.  We go to the movies maybe once every couple months.  Usually we rent them at Tom's.
Q       Okay.  But you never get out and go to church or club or fraternal organization?
A       No.  My husband belongs to them but I don't like to go.
Q       Do you ever try to get any exercise or anything like that?
A       Yes, I do.
Q       And what do you do?
A       My husband takes me for walks.
Q       How, how far do you walk?
A       Well, we only walk a couple blocks because he has a four-way bypass and he only has 35 percent functioning of his heart.
Q       Hum.
A       So he can't walk a long way and I can't walk by myself so other than that all the exercise equipment I've tried I've hurt myself on so - -
Q       Um-hum.  What have you tried?
A       I've tried a treadmill, that didn't work, I tried the manual treadmill, that didn't work, I tried - -

                        *               *               *

A       I tried those little bands that you hook up to the door and that was way too

27

complicated. I tried different exercise videos but between trying to concentrate on what they're doing and doing what I'm doing, it makes you want to just get rid of the television altogether. But an abosizer (sic) thing which I wasn't thinking about the fact that you would have to pull your arms back in and balance and can't do that. I bought a Gazelle, that's, that's our last contention and the Gazelle doesn't work really good because you have to be coordinated to do the things together, it just doesn't work.

Q     Um-hum. The - - now there's a notation in the record that you use to drink alcohol or take drugs.

A     Yes, sir, I did when I was a teenager and young adult.

Q     And when - - do you still do any of that stuff?

A     No, sir. I've been clean and sober for 18 years.

Q     And so nothing, nothing since roughly 1990?

A     Even before that, I don't drink, don't do drugs.

Q     Okay.

A     I did have a lapse in like '89 but that was just one day.

Q     Okay.

A     I smoke cigarettes and I drink half and half coffee.

Q     And how much do you smoke?

A     Half a pack a day.

Q     But you're not being treated for any lung condition or - -

A     No, sir.

Q     Okay.

ALJ     I don't have any other questions of the claimant.

                      *            *            *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q     You say you haven't driven since 1983, do, do you maintain your license?

A     No.

Q     So the last time you had a actual valid license was around 1983?

A     Yes.

                      *            *            *

Q     Now I want to talk a little bit about a couple - - anything else that might cause your balance to be worse. You've told us I believe obviously the stress, arguments, were, would make it worse?

A     Yes.

Q     What about things like lightening?

A     Florescent lights, the kind that flicker - - these aren't bad, a couple of them, but the blue ones are best because they don't - - computer screen you can actually see - - I've noticed that I can see it flicker now. A lot of visual input all at once - - grocery stores are really difficult because you have to - - you're looking down and up and down and up and you've got all this stuff that you're looking at and it's really hard to take it all in. The weather, I can pretty much tell you when it's going to thunder storm real quick because you can feel the pressure.

Q     And how does that affect then your, your balance?

A     It just, it makes it - - it'll be okay and then all of a sudden it just feels like you're getting a push and then from then on you're just off. You walk into things and usually I'll just

tell him my balance is out, I might have to go sit down.

Q        Okay.  You, you described that you fall, how often do you fall?

A        Oh, once or twice a week.

Q        And have you made accommodations in your household to try to keep those falls from happening?

A        Yes.

Q        What kind of things have you done?

A        I have night lights close to the floor in all the rooms.  My husband replaced the stairs in the house because it's an older house and it was - - the floors were, they settled and I fell down the stairs a couple of times and then I cracked my tailbone and so he replaced the stairs.  And that keeps him busy keeping those level, handrails.  Try to keep everything flat.  He replaced the front porch on the house with a large cement slab, got rid of the stairs.  He's gradually leveled out pretty much the entire landscape.  The front walk has been leveled out, he's leveling out the back yard, he's put in large stones, posts and things here and there that I have so I can hold onto them.  Little places I can sit down.

Q        Is it easier to walk on carpeting or bare floors?

A        Bare floor.

Q        And have, have you done that in your house?

A        Yes.  I don't have carpeting anywhere because you catch your feet on it.  Nothing, I don't want anything moved in the house.  That's one of the biggest things that it, it took him to learn, my children learned it from the time they were little.  Don't, don't move the furniture because if you're concentrating on going somewhere you're not concentrating on looking where you're going.  So I would walk into things.   If you move a couch just a little bit, that's enough for me to run into it and then I have a huge bruise.  You cannot leave things on the floor.  You - - shoes, clothes, books, you just, you can't leave them on the floor because I won't notice that they're there, I'll fall over them.

Q        Now we talked some about your depression and also PTSD. You described an abusive childhood but in your mind is there one precipitating factor?  Generally with the Posttraumatic Stress Disorder there may well be like one precipitating factor.  Was that the case for you?

A        Yeah.  Basically, it was - - it lasted for 12 years with my stepfather and then when I was 16 my real dad killed him and that from then on was just kind of - - you know, it was like I was responsible for that, even though theoretically I know that this man was a horrible monster.  You know, I mean my family blamed me for it and still to this day I get those looks, so I really don't have  anything to do with my family.  But that's part of the stress so - -

Q        Did you get some therapy and treatment at that time?

A        Yeah, I did.

Q        And then how did you cope with it for the years where you really didn't demonstratively have the, demonstratively have the PTSD?

A        Well, I drank for a while and that helped until I kept getting into a lot of fights with people because I'm,  I'm - - because the PTSD I'm what's called an angry drunk.  I don't get jolly and happy and have a good time, I get drunk, I want to fight.  And then when the balance thing went and then my son was born it just kind of that's enough of that and basically I've forgotten a lot of stuff.  Most of my childhood is gone, I mean I know what my family has

told me but most of it for a personal memory is gone.  And that's okay, I don't mind.

           *                  *                *

REEXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q      How tall are you now?

A      5'4".

Q      5'4" and what's your current weight?

A      207.

Q      Is that normal for you or is it up or down?

A      It's up about 50 pounds.

Q      Since when?

A      2000, it started in 2000 gradually and then in 2002 it jumped again and then in 2004 it jumped another 30, 40 pounds.

Q      And do you know why that is?

A      Yeah, you can't move around.

Q      Just lack of exercise?

A      Lack of exercise.

Q      Yeah.

A      You get depressed, you eat.

           *                  *                *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q      Okay.  Mr. Panza, could you please assess the claimant's past jobs by job title, exertional level, skill level and any transferability of skills?

A      Yes, Your Honor.  The claimant was previously employed for Aegis as - - in customer service arranging for contracts and subcontracts, a semiskilled position that's sedentary level.  Telemarketing job prior to that was semiskilled, sedentary - - did I say sedentary for the first one?

Q      Yeah.

A      The job at Go-Mart as a cashier/clerk was at the light level, semiskilled, no transferability of skills, Your Honor.

Q      From any of them?

A      No.

Q      Okay.  Let me give you a hypothetical question.  If we assume a person of the same age, education and work experience as the claimant but assume a hypothetical person who is limited to light work as that's defined in the Commissioner's regulations, but there'd be no climbing ladders, ropes, scaffolds, stairs or ramps.  No more than occasional balance, stoop, kneel, crouch or crawl.  The person should be able to change positions from sit to stand or vice versa for brief time, and by brief I mean just for a minute or two at least every half hour.  There should be no, no exposure to extremes of fumes, dusts, gases or other respiratory irritants and in that I would include like mildew or mold.  There's be no exposure to significant work place hazards like heights or dangerous, moving machinery.  The job should not involve - - no work with the general public, no fast paced or assembly line work - - you know, actually forget - - leave that one out and no close interaction with coworkers or supervisors and no more than occasional changes in the work setting.  Would there be any jobs such a person could do at the

light or sedentary levels?

*         *         *

A      Your Honor, considering the hypothetical you've given me for comment it would be my testimony the jobs that exist in the national economy, also in the combined economies of Pennsylvania and West Virginia at the light level, unskilled the position of folder, garment and laundry, 125,000 jobs in the national economy, at least 2,000 jobs in the state of, states of Pennsylvania and West Virginia.  Also at the light level, unskilled, the position of a food caterer, preparation helper, 175,000 jobs in the national economy, at least 4,600 in the combined states of Pennsylvania and West Virginia.  And also at the light level, unskilled, the position of cafeteria worker, 420,000 jobs in the national economy and at least 4,900 in the combined states of West Virginia and Pennsylvania.

Q      Any sedentary work that would fit this?

A      At sedentary level, Your Honor, the position of a surveillance system monitor operator, 200,000 jobs in the national economy and at least 3,000 jobs in the combined states mentioned, unskilled, all consistent with the <u>DOT</u>.

Q      Okay.  Now how many days, if any, could a person miss work and still do these kinds of unskilled jobs?  Well, you know what, I don't  - - let me just stop you for a second, I'm sorry, I forgot, I made - - I didn't  - - assuming we have this hypothetical question I gave you would that allow for any of the past work?

A      No, Your Honor.

Q      Okay.  Now let me ask you, if a person has to miss work how much, if any, could they miss work and still do any of these other unskilled jobs?

A      The general unwritten standard is that an individual will be tolerated for absenteeism up to one and one-quarter days during the probationary period, which usually is about 90 days, the first three months.  And if it exceeds that average of one and one-quarter days of absenteeism the employee is usually terminated, Your Honor.

Q      Okay.  Now if a person had to lie down during part of a workday in the morning or afternoon outside of scheduled breaks for a little while, say 15 to 20 minutes at a time, would, would that be possible at any job?

A      No, Your Honor, it would not be tolerated.

Q      Okay.

*         *         *

E.      <u>Lifestyle Evidence</u>

The following evidence concerning Claimant's lifestyle was obtained at the hearing and

through medical records.  The information is included in the report to demonstrate how

Claimant's alleged impairments affect his daily life:

•     can stand for 10-15 minutes at a time (Tr. 46)
•     can sit for 15-20 minutes before needing to stand (Tr. 46)
•     dusts and runs the vacuum (Tr. 55)

- folds clothes (Tr. 55)
- husband does most of the cooking; she can only make cereal and heat up previously made items (Tr. 55)
- crochets and quilts (Tr. 56)
- does some yard work - cuts weeds, pulls leaves, uses the hose (Tr. 56)
- exercises - walks outside and has tried multiple pieces of exercise equipment (Tr. 58-59)
- has not used alcohol or drugs since 1990 (Tr. 59)
- smokes half a pack of cigarettes per day (Tr. 60)
- takes care of her dog but has help (Tr. 153, 154)
- makes breakfast (Tr. 153)
- reads (Tr. 53, 153, 157)
- watches television (Tr. 55, 153)
- has trouble sleeping (Tr. 154)
- takes longer to care for her hair but otherwise has no problems with personal hygiene (Tr. 154)
- keeps a list to remind her to take daily medications (Tr. 154)
- can make small meals but relies on her children to cook regular meals (Tr. 155)
- can do dishes if they're lightweight (Tr. 55, 155)
- needs encouragement to complete tasks (Tr. 155)
- is afraid of the lawnmower so does not cut the grass (Tr. 156)
- goes outside everyday but does not leave her yard (Tr. 156)
- does not drive (Tr. 55, 156)
- does not go out alone because she is afraid of falling (Tr. 156)
- goes shopping but not alone (Tr. 55, 56, 156)
- has children and friends help her pay bills, count change, handle a savings account, and use checkbook/money orders (Tr. 156)
- listens to music (Tr. 157)
- spends time with others (Tr. 157)
- is anti-social; does not visit with others or have others visit her (Tr. 57)
- can no longer do tarot card readings and can no longer volunteer for carnivals and other fundraisers (Tr. 57)
- goes out to eat once or twice per week (Tr. 58)
- does not belong to any clubs or organizations (Tr. 58)
- does not leave the house alone (Tr. 157)
- has problems getting along with others (Tr. 157)
- does not follow spoken instructions well (Tr. 158)
- does not get along well with authority figures (Tr. 159)
- does not handle stress well (Tr. 159)

## III. The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant argues that the ALJ's decision to deny the Claimant SSI and DIB is not

supported by substantial evidence because the ALJ failed to properly apply the regulations and

Ruling 96-7p in assessing Claimant's credibility with respect to her subjective complaints.

Commissioner contends that the ALJ did not err in assessing Claimant's credibility.

B.    Discussion

1.    Whether the ALJ Erred in Determining Claimant's Credibility.

Claimant argues that the ALJ's decision is not supported by substantial evidence because

the ALJ improperly applied the regulations and Ruling 96-7p in assessing Claimant's credibility

with respect to her subjective complaints.  Specifically, Claimant argues that though the ALJ

cited the factors, he failed to evaluate Claimant's subjective complaints in accordance with the

factors.  Rather, according to Claimant, the ALJ briefly mentioned daily activities but not during

the credibility analysis; made no mention of the location, duration, frequency, and intensity of

pain and symptoms, aggravating factors, and side effects from steroids; ignored all Claimant's

testimony regarding changes made to her home; and failed to acknowledge Claimant's numerous

attempts at treatment modalities.

Commissioner contends that the ALJ properly followed the controlling regulations in

finding that Claimant's claims of disabling symptoms were not fully credible.  Additionally,

Commissioner maintains that although the ALJ found Claimant's subjective complaints to be

exaggerated, the ALJ accommodated all of Claimant's subjective complaints in the RFC

analysis.

This Court's review of the ALJ's decision is limited to determining whether the decision

is supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3) (West 2010).

"Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than

a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. Id. at 594. The ALJ must next "expressly consider" whether a claimant has such an impairment. Id. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled. Id. at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. Id.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp.

776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). An ALJ is afforded great deference in credibility determinations; however, the ALJ must sufficiently articulate the reasons for his credibility determination in order for the Court to uphold the determination. Neave v. Astrue, 507 F.Supp.2d 948, 962 (E.D.Wis. 2007). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

The ALJ acknowledged the two-part test for evaluating Claimant's symptoms and found that Claimant's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 21). Though the ALJ acknowledged the two-part test, the Court must agree with Claimant and find that the ALJ erred when assessing Claimant's credibility regarding the alleged symptoms.

To evaluate the claimant's symptoms and determine the extent to which the symptoms limit the claimant's capacity to work, the ALJ is to consider the symptoms and objective medical evidence. 20 C.F.R. § 404.1529(c) (2010). When considering how to evaluate the claimant's symptoms, the ALJ is to consider:

(i)     [The claimant's] daily activities;
(ii)    The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [the claimant's] pain or other symptoms;
(v)     Treatment, or other medication, [the claimant] receive[s] or ha[s] received for relief of [] pain or other symptoms;

(vi)     Any measures [the claimant] use[s] or ha[s] used to relieve [] pain or other symptoms; and

(vii)    Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3)(i)-(vii).  "While the ALJ need not elaborate on each of these factors when making a credibility determination, he must sufficiently articulate his assessment of the evidence to assure the court that he considered the important evidence and to enable the court to trace the path of his reasoning."  Neave, 507 F.Supp.2d at 963.

       The ALJ recognized and enumerated the factors but failed to evaluate them in accordance with Claimant's subjective complaints and symptoms.  (Tr. 21).  As to the first factor, the ALJ briefly mentions Claimant's daily activities but does so when evaluating whether Claimant has an impairment or combination of impairments that meets or medically equals one of the listed impairments.  (Tr. 19).  Even then, the ALJ only states that "claimant does minimal cooking, and some light house cleaning including washing the dishes, with breaks (Exhibit 9E)."  (Id.)  The ALJ fails to mention Claimant's daily activities in evaluating Claimant's credibility.   Factor two calls for the ALJ to consider the location, duration, frequency, and intensity of the claimant's pain.  With regard to these considerations, the ALJ states that Claimant "was noted to have very likely exaggerated her symptoms" and has maintained employment despite being affected by loss of balance since 1987.  (Tr. 21).  The ALJ fails to mention any factors that precipitate or aggravate the Claimant's symptoms as required by factor three, acknowledge any of Claimant's medications as required by factor four, or acknowledge any treatment or other measures taken by Claimant to relieve pain as required by factors five and six.  The ALJ's credibility analysis was inadequate: it merely consists of a 10-line paragraph in which the ALJ finds that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not

entirely credible." (Id.)  Therefore, the matter must be remanded for the ALJ to adequately consider Claimant's credibility in accordance with the credibility factors.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED** and the matter be **REMANDED** because the ALJ did not adequately set forth the reasons for discrediting Claimant's subjective complaints and symptoms.

2.    Commissioner's Motion for Summary Judgment be **DENIED** and the matter be **REMANDED** for the same reason set forth above.


Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: May 10, 2010

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE