IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BILLY JO ANDERSON,

       Plaintiff,

v.                        CIVIL ACTION NO. 1:09CV125
                                  (Judge Keeley)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

       Defendant.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b)(1)(B), Fed.R.Civ.P. 72(b) and Local Court Rule 4.01(d), on August 25, 2009, the Court referred this Social Security action to United States Magistrate Judge James E. Seibert with directions to submit proposed findings of fact and a recommendation for disposition.

On May 10, 2010, Magistrate Judge Seibert filed his Report and Recommendation ("R&R") and directed the parties, in accordance with 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 6(e), to file any written objections with the Clerk of Court within fourteen (14) days after being served with a copy of the R&R. On May 18, 2010, the defendant, Commissioner of Social Security, filed objections to the Magistrate Judge's R&R and on June 2, 2010, counsel for Anderson filed a response to the defendant's objections.

## I. PROCEDURAL BACKGROUND

On December 22, 2004, Billy Jo Anderson ("Anderson") filed an application for Disability Insurance Benefits ("DIB") and

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Supplemental Security Income ("SSI") alleging disability due to Post Traumatic Stress Disorder ("PTSD"), Meniere's Disease, fibromyalgia, general fatigue syndrome, muscle disorder undiagnosed, and arthritis beginning October 20, 2004. The Commissioner denied the claim initially on March 15, 2005 and on reconsideration on January 10, 2006. Following a request for a hearing, an administrative law judge ("ALJ") held a hearing April 6, 2007.

On July 2, 2007, the ALJ determined that Anderson was not disabled. On June 26, 2009, the Appeals Council denied Anderson's request for a review thus making the ALJ's July 2, 2007 decision the final decision of the Commissioner. On August 25, 2009, Anderson timely filed this action seeking review of the final decision.

## II.  PLAINTIFF'S BACKGROUND

On October 20, 2004, the onset date of alleged disability, Anderson was forty-four (44) years old, and was forty-seven (47) on the date of the ALJ's decision. Therefore, pursuant to 20 C.F.R. §§ 404.1563(c), 416.963(c) (2009), she is considered a "younger person," under the age of 50. Anderson is a college graduate with one year of post-graduate work. Her employment history includes

work as a customer service worker, cashier, telemarketer, and in telecommunications.

### III.  ADMINISTRATIVE FINDINGS

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1.  Anderson met the insured status requirements of the Social Security Act through December 31, 2009;

2.  Anderson has not engaged in substantial gainful activity since October 20, 2004, the alleged onset date;

3.  Anderson has the following severe impairments: obesity, fibromyalgia with headaches, Meniere's disease with balance problems, a history of head traumas, an anxiety-related disorder and depression. Her impairments do not, alone or in combination, meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.  Anderson retains the residual functional capacity to perform the exertional demands of light work or work that requires a maximum lifting of twenty pounds and frequent lifting of ten pounds with the following limitations, no climbing ladders, ropes, scaffolds, stairs or ramps, no more than occasional balancing, stooping, kneeling, crouching or crawling, opportunity to change positions briefly (one to two minutes) at least every 30 minutes, no exposure to significant workplace hazards such as heights or dangerous moving machinery, no contact with the general public, no close interaction with coworkers or supervisors, not more than occasional changes in the work setting, and must be permitted to miss up to one day of work per month;

5.  Anderson is unable to perform any of her past relevant work (20 CFR § 404.1565);

6.  Anderson was 44 years on the alleged disability onset date and is considered a "younger individual" within the meaning of the regulations (20 CFR § 404.1563);

7.  Anderson has "at least a high school education" and is able to communicate in English (20 CFR § 404.1564);

8.  Transferability of skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that Anderson is not disabled, whether or not she has transferable job skills (See SSR 82-41 and 20 CFR § 404, Subpart P, Appendix 2);

9.  Anderson has the residual functional capacity to perform jobs that exist in significant numbers in the national economy (20 CFR §§ 404.1560(c), 404.1566, 416.960(c) and 416.966); and

10. Anderson has not been under a "disability," as defined in the Social Security Act from October 20, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## IV.  DEFENDANT'S OBJECTIONS

The Commissioner objects to the Magistrate Judge's conclusion that the ALJ's credibility analysis was inadequate because it failed to "elaborate on each of the seven factors mentioned in the regulations." Anderson contends that the Magistrate Judge correctly concluded that the ALJ had failed to follow the criteria prescribed for the analysis established in the regulations and in Social

Security Ruling ("SSR") 96-7p, 1996 WL 374186 (S.S.A)(July 2, 1996).

## V.  MEDICAL EVIDENCE

The medical evidence of record generally establishes that Anderson complained of vertigo and headaches as early as 1987 and received treatment from a number of medical practitioners for vertigo, headaches, balance problems, post traumatic stress disorder ("PTSD"), fibromyalgia, and Meniere's Disease.

In detail, the medical evidence of record includes:

1.   Medical Records for the period from June 29, 1987 through November 2, 1987 from West Virginia University Hospital ("WVUH"), indicating Anderson received treatment for vertigo, headaches, occasional weakness and numbness in her hands, memory loss and possible Meniere's Disease, labryrinthitis, or MS;

2.   A June 29, 1987 out-patient history and physical examination note from WVUH indicating a referral from Cr. Cassicola of the Fairmont Clinic for an evaluation regarding vertigo and headaches.  Anderson complained that she experienced daily the feeling that objects in her environment were moving slightly and were blurred, that physical exertion and emotional strain caused the feeling that objects were moving and blurred to worsen, that her feet and hands fell asleep in the afternoon, that she had

occasional weakness in her legs, and that she had some memory loss. She received prescriptions for Antivert and Inderal, a referral for an MRI and audiogram and directions to return in two weeks. The note references a prior examination that Anderson had in Cleveland by Dr. Mallik, an ENT. That examination included a CT, ENG, allergy testing, and audiogram, all of which resulted in normal findings;

3.    A July 6, 1987 audiogram report from WVUH indicating Anderson's hearing was within normal limits, bilaterally;

4.    An August 3, 1987 outpatient History and Physical Examination note from WVUH indicating Anderson reported her headaches had improved but her vertigo had gotten worse. Anderson was told to decrease her caffeine intake and to continue her medication;

5.    A September 14, 1987 Outpatient History and Physical Examination report from WVUH indicating Anderson continued to complaint of vertigo and headaches. Plan was to continue Antivert and Inderal and to start Elavil;

6.    An October 2, 1987 Outpatient History and Physical Examination report from WVUH signed by Dr. Atkinson and Dr. Hayden indicating Anderson was referred to the Neurology Clinic due to her extensive history of balance problems;

7.  A November 2, 1987 Outpatient History and Physical Examination note from WVUH indicating Anderson reported no improvement in vertigo or headaches.  Plan was to continue Inderol and Elavil and a referral for an ENG;

8.  A February 23, 2000 report from Dr. Kenneth Hilsbos, Fairmont Clinic, indicating an assessment for Meniere's Disease and anxiety and depression. Anderson reported having Meniere's disease since 1984. Physical examination revealed weight of 193 pounds, blood pressure 110/70, clear TMs, no perforation, clear canals, round and reactive pupils to light bilaterally, intact extraocular movements, supple neck with no nodes, no carotid or thyroid bruits, no thyromegaly, clear heart and lungs, no cyanosis, pallor, clubbing edema or rash of the extremities, soft, nontender, non-distended abdomen with normal bowel sounds, normal gait, intent cranial nerves II-XII, deep tendon reflexes 2/4, Babinski down bilaterally and symptoms aggravated by Hall-Pike maneuvers. At Anderson's request, Dr. Hilsbos referred her to Ruby Memorial for a neurology evaluation;

Dr. Hilsbos noted that Anderson requested something for irritability and mood swings.  When he attempted to explain to Anderson that these symptoms could have resulted because she had chosen to stop taking Prempro, Anderson refused to discuss the

issue and renewed her interest in obtaining a prescription for an anti-depressant. Dr. Hilsbos noted that, at this time, Anderson had no new onset of symptoms related to her Meniere's Disease and his assessment was Meniere's Disease and anxiety and depression. He renewed her prescriptions for potassium chloride, Hydrochlorothiazide and Meclizine, and gave her a prescription for Prozac;

9.  A February 25, 2001 evaluation at University Health Associates ("UHA") indicating Anderson complained of right hand pain with symptoms that suggested ulnar neuropathy. The report reflects that the test results show a mild right carpal tunnel syndrome and no evidence of right ulnar neuropathy or right cervical radiculopathy. It also notes that Anderson reported a slight improvement in the pain while typing. Physical examination revealed positive Phalen's test and positive elbow flexion test. Anderson was given a prescription for a carpal tunnel splint;

10. A September 20, 2001 Outpatient History and Physical Exam from UHA indicating Anderson complained of dizziness and a referral for a repeat MRI;

11. A September 22, 2001 MRI report from FGH indicating brain demonstrates normal signal characteristics, ventricles and extra axial spaces within normal limits in size and configuration for

patient's age, no mass lesion or mass effect, good gray white differentiation, normal flow void within the major intracranial vessels and normal midline structures;

12.  A December 10, 2001 progress note from UHA indicating Anderson complained of depression, PTSD and dizziness.  Physical examination revealed good memory, attention, knowledge, coordination and sensation, appropriate gait, and orientated times three.  Plan was to review the results of the FGH MRI;

13.  A March 5, 2002 report from Jo Ann Allen Hornsby, M.D., Assistant Professor, Section of Rheumatology, WVU Department of Medicine, indicating Kevin Michael Clarke, M.D., had referred Anderson for an evaluation of positive ANA.  Physical examination revealed weight 212 pounds, blood pressure 124/80, fibromyalgia tender points at the occiput, lateral transverse processes, costochondral junctions, trapezius muscles, and the supraspinatus muscles but no tenderness below the waist. Dr. Hornsby's assessment was joint pain and positive ANA that Dr. Hornsby felt was "clinically insignificant. Dr. Hornsby noted that Anderson may have a component of fibromyalgia but her pain is "more regional in the neck and shoulder area." Dr. Hornsby gave Anderson brochures on carpel tunnel syndrome, fibromyalgia and recommended she follow up with Dr. Clarke;

14.  A March 22, 2002 medical note from MedPlus Health Care ("MedPlus") indicating Anderson complained of balance problems, a primary diagnosis of fibromyalgia, and a secondary diagnosis of Meniere's Disease;

15.  A May 2, 2002 medical note from MedPlus indicating Anderson complained of being tired and not sleeping. The primary diagnosis was fibromyalgia and insomnia and the secondary diagnosis was depression;

16.  A May 16, 2002 medical note from MedPlus indicating Anderson reported feeling slightly better. The primary diagnosis was fibromyalgia and the secondary diagnosis was insomnia and depression. Medications listed were Flexeril, hydrochlorothiazide, Effexor, and Zanaflex;

17.  A July 17, 2002 medical note from Dr. Kevin Clark of MedPlus indicating Anderson complained of hearing problems and muscle spasms and stated she wanted to take a leave of absence from work. The primary diagnosis was PTSD and a secondary diagnosis of fibromyalgia. Anderson reported the Xanaflex helped. Dr. Clark noted Anderson would be off work until August 5, 2002;

18.  An October 15, 2002 medical note from MedPlus indicating Anderson complained of being achy all over, nausea and headaches.

The primary  diagnosis was URI and the secondary diagnosis was headache and nausea;

19.  An October 21, 2002 medical note from MedPlus indicating Anderson complained of continuing nausea and diarrhea. The primary diagnosis was CFS and Meniere's Disease and the secondary diagnosis was fibromyalgia, PTSD, illegible in report;

20.  A February 6, 2003 consultation at UHA indicating Anderson complained of pain in dorsal aspect of hand, pain in area of thumb, and numbness in ulnar aspect of hand. Physical examination revealed numbness in area of small and right fingers of right upper extremity, no Tinel's sign at the wrist, some shocks with tapping of her ulnar nerve at the elbow, intact grip, and no evidence of motor weakness. Assessment was symptoms of ulnar nerve compression of right upper extremity, put pillows in the area of antecubital fossa at night so she cannot hyperflex her elbow. Plan was to obtain EMG/nerve conduction to look for right ulnar nerve compression;

21.  A February 19, 2003 Electromyogram report from UHA indicating evidence of mild right carpal tunnel syndrome and no definite evidence of right ulnar neuropathy or right cervical radiculopathy;

22.  A March, 2003 report indicating complaints of muscle spasms, leg problems, and headaches and treatment with B-12 and folic acid;

23.  A September 30, 2003 chest x-ray report from FGH indicting a normal chest, lungs clear and well expanded, normal heart size and within normal limits pulmonary vasculature, and no bony abnormality;

24.  An October 17, 2003 operation report from Dr. Tom Turner, FGH documenting a surgical laparoscopy for dysfunctional uterine bleeding, dysmenorrhea, dyspareunia, pelvic pain, fibroid uterus, vascular adhesions, left lube and right ovary cyst;

25.  A November 3, 2003 report from MedPlus indicating that Anderson's Meniere's Disease has been stable, her medications "seem to be working," that she was working on a steady basis and that this was probably "about as good as it gets." Recommendation was no change in treatment;

26.  A January 19, 2004 medical record from MedPlus indicating complaints of a sinus infection, swollen glands, headaches, mild tenderness in occipital area of head, more so on left, spasmed cervical and scalenus muscle, mildly spasmed left trap muscle; food ROM of neck, retracted TM's, clear lungs and regular heart. She was

given a Z-pack, given a couple of days off work, and directed to return if symptoms did not improve;

27.   An April 28, 2004 report from MedPlus noting, on physical examination, Anderson "really looks good," and that she has had only one headache since she began doing her neck exercise and taking Maxalt. The plan was to do an extensive profile, obtain lab workup, reassess her rheumatoid status, referral for physical therapy for cervical traction and possible home traction "because her [Anderson's] schedule is such that she is usually too busy to come here on a regular basis;

28.   A July 27, 2004 medical record from MedPlus noting that Anderson needed certification of healthcare provider filled out for Aegis employment that she suffers from chronic fatigue syndrome, fibromyalgia, PTSD, and Meniere's Disease;

29.   A September 22, 2004 medical record from MedPlus indicating Anderson complained of extreme fatigue, joint aching and stiffness, muscle aching, headaches and generalized malaise. Physical examination revealed dull TMs, red and swollen nose, mucopurulent drainage in her throat, no adenopathy or thyromegaly, pale color, and clear lungs. Plan was to get immunoglobulins and a RAST/MIA and to follow Anderson closely every couple of months. The diagnosis was   Meniere's Disease related to head traumas

suffered as a child and possible lupus versus a rheumatoid disorder, chronic fatigue syndrome, fibromyalgia and "possible common variable immune deficiency." The record notes that Anderson had signed up for short-term disability;

30. A September 29, 2004 medical record from MedPlus indicating Anderson needed certification of Health Care Provider for Aegis to verify has chronic fatigue, mild PSD, and Meniere's Disease;

31. An October 14, 2004 treatment note from Susan Capelle, M.D., indicting a chief complaint of bleeding problems and PMB and a diagnosis of enlarged uterus, menses, AUB/DUB, post-menopausal bleeding. Dr. Capelle scheduled a CBC and a pelvic ultrasound;

32. A November 17, 2004 report from an ultrasound revealed an enlarged leiomyomatous uterus, normal endometrium, normal left and right ovaries, no evidence of free fluid in cul de sac, and prominent nabothian cysts seen on cervix. Recommendation was for an EMBx to rule out malignancy;

33. A November 18, 2004 report from an endometrial biopsy indicating a weak proliferative endometrium with tubal metaplasia and eosinophilic cell changes and no malignancy;

34. A December 14, 2004 report form MedPlus indicating Anderson was "fired" from her job due to absenteeism. The note

indicates that Anderson has high ANA titers, is questionable lupus versus fibromyalgia, exhibits symptoms of MS, has spacial vision, weakness, is extremely clumsy, drops things and is extremely fatigued. Physical examination revealed dull TMs, within normal limits cranial nerves 1-12, and clear lungs. The note further reflects that

> At this point in time, I don't know what else to do with her except be supportive . We will go ahead and get another Epstein-Barr just to document chronic fatigue. With her symptoms being as they are, it may behoove her to apply for disability. We will get another MRI of her brain and her follow-up after that.

The note also reflects that "nothing has ever shown up" on the previous MRIs;

35.  A February 5, 2005 emergency department record from FGH indicating complaints of dizziness, chest pain, and pain in neck, shoulders and hips.  A notation on the record indicates Anderson left without being seen ("LWOBS");

36.  A February 16, 2005 Physical Residual Functional Capacity Assessment indicating a primary diagnosis of fibromyalgia, no exertional, postural, manipulative, visual, communicative, or environmental limitations. Significantly, the report noted that Anderson's symptoms were not credible and the physical findings did not support her allegations;

15

37.  A March 4, 2005 Psychiatric Review Technique from Aroon Suansilppongse, M.D., indicating an anxiety-related disorder, alleged PSTD and pain. Dr. Suansilppongse noted only mild limitations in restrictions of daily living, difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence, and pace. He further noted that there was insufficient evidence to determine if Anderson had experienced any episodes of decompensation. He also noted that the evidence did not establish the presence of "C" criteria, that the file did not contain any formal mental health report, mental condition seems to be stable with treatment, activities of daily living are largely limited due to her alleged physical restrictions, that she receives prescriptions for Xanax from a treatment provider at MedPlus, and that her allegations are partially credible;

38.  A May 11, 2005 report from Peggy J. Allman, M.A., licensed psychologist, indicating Anderson states she has PTSD, Meniere's Disease, fibromyalgia, fatigue, muscle disorder and arthritis. Current medications are Antivert, Hydrochlorothiazide, K-Dur, MagOx, Zanaflex, Hydroxyzine, Maxalt, and Xanax. During the clinical interview, Anderson reported difficulty falling asleep, good appetite, weight gain, crying episodes, sometimes feeling uncomfortable around people, one panic attack, compulsive behaviors

16

i.e., bed must be made a certain way, blinds in her house must be at the same length, and checking things constantly. The mental status examination revealed that Anderson had a positive attitude, was cooperative, had good eye contact, adequate length of verbal responses, and a sense of humor, was spontaneous, had relevant speech, was oriented x4, had a depressed mood and restricted affect, displayed no evidence of disturbance of thought process, thought content, or perception, had within normal limits insight, had suicidal ideation with no intent, had homicidal ideation with plan and intent but no plan to follow through, had mildly deficient immediate memory, within normal limits recent memory, and moderately deficient concentration.

The WASI Assessment was verbal IQ 98, performance IQ 93, full scale IQ 96, vocabulary 8, similarities 12, block design 9, and matrix reasoning 8. The MMPI-2 Diagnostic Impressions were Axis I: 296.52 - bipolar disorder - I, most recent episode depressed, 305.0 alcohol abuse in total sustained remission, 305.7 - amphetamine abuse in total sustained remission, 305.5 - opioid abuse (codeine) in total sustained remission, Axis II obsessive-compulsive disorder, Axis III: fibromyalgia and Meniere's Disease from client report, Axis IV: problems with primary support group and Axis V: GAF 60. Ms. Allman noted that the valuation indicated a chronic

17

mental illness and that Anderson's "ability to be gainfully employed at this point is highly doubtful. Ms. Allman also noted that results from the MMPI-2 Minnesota Multiphasic Personality Inventory -2, a paper and pencil assessment of psychopathology and personality, indicated symptom exaggeration;"

39. A June 5, 2005 medical note from MedPlus indicating refills of

prescriptions;

40. A June 6, 2005 report indicating treatment for allergic rhinitis, medication refills, and noting Anderson had fibromyalgia and Meniere's disease;

41. A July 21, 2005 Routine Abstract Form from Joann * (illegible signature) indicating Anderson reported having PTSD, Meniere's Disease, Fibromyalgia, fatigue, muscle disorder, and arthritis. The mental status examination Anderson was oriented X3, had normal speech, no delusions, hallucinations, suicidal or homicidal ideation, mildly deficient judgment, broad affect, irritable and angry mood, normal perception, moderately deficient insight, normal thought content, psychomotor activity was fidgety, normal immediate and recent memory, moderately deficient social functioning, normal concentration, and normal persistence and pace.

The DSM-IV criteria Axis I: 300, Axis II: V71.09, Axis III: fibromyalgia, Meniere's Disease, chronic fatigue, Axis IV: relationship and financial problems, and Axis V: 60. The report notes that Anderson is in counseling to reduce anxiety and elevate depressed mood;

42. An August 30, 2005 report from Anderson's counselor indicating in fourteen counseling sessions she demonstrated only mildly deficient judgment, moderately deficit insight, normal concentration, persistence and pace and a diagnosis of anxiety disorder, not otherwise specified;

43. A November 16, 2005 Psychiatric Review Technique from George David Allen, Ph.D, indicating a diagnosis of Bipolar I, most recently depressed and OCD Personality. Allen noted no limitation in restriction of activities of daily living and no episodes of decompensation each of extended duration, and mild limitations in difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence and pace. He further noted that Anderson was partially credible;

44. A January 10, 2006 Physical Residual Functional Capacity Assessment from Cynthia M. Osborne, M.D., indicating a primary diagnosis of fibromyalgia and a secondary diagnosis of Meniere's Disease. Dr. Osborne noted that Anderson could occasionally lift

50 pounds, frequently lift 25 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, had unlimited ability to push or pull (including operation of hand and/or foot controls), could frequently climb a ramp or stairs, could never climb ladders, ropes, scaffolds, could occasionally balance, frequently stoop, kneel, crouch, or crawl, had no manipulative, visual, or communicative limitations, and had no environmental limitations except must avoid concentrate exposure to hazards. Dr. Osborne reduced Anderson's RFC to medium due to physical problems that could cause the pain alleged and psychiatric problems;

45. A June 5, 2006 Progress Note from Clarksburg Veterans Administration Medical Center ("VAMC") indicating this was Anderson's initial visit and evaluation and that she planned to have total care at the VAMC. Anderson reported being on medical leave since 2004 for fibromyalgia, feeling depressed, hopeless, with little interest in doing things for the past month, no alcohol used in past 12 months, and smokes one pack a day. Anderson reported a history of muscle spasms in legs, fibromyalgis, MS, balance problems, Meniere's Disease, migraine headaches, seasonal allergies, tinnitis, chest pain, and abnormal uterine bleeding.

Current medications listed as Maxalt, HCTZ, K-Dur, Zanaflesx, Antivert, Naproxen, Xanax and Wellbutrin. Physical examination revealed blood pressure of 128/78, weight 205.2, clear TMs, no edema, alert and oriented;

46. A June 13, 2006 Weight Management Evaluation from VAMC indicating Anderson was moderately dissatisfied with appearance of her body and stated the reasons for her obesity were emotional stress, family and relationship problems, not enough physical activity, and difficulty with self-control. Anderson was given pamphlets to help motivate weight loss;

47, A June 13, 2006 Gynecology Consult report from VAMC indicating Anderson reported irregularity of cycles and associated dysmenorrhea with heavy flow, no problems with bladder, bowel, or breast. She was encouraged to get annual gynecologic examination, pap smear of the cervix and mamogram;

48, A June 15, 2006, Radiology Report indicating Anderson had a Myocardial Perfusion. The impression was that it was "probably normal exam" with a small perfusion defect at rest and stress in apex, no ischemia and normal left ventricular function;

49, A June 16, 2006 progress note from VAMC indicating Anderson's chief complaint was that she was nervous and anxious and easily frustrated. The mental status exam revealed that Anderson

was alert and oriented to person, place, time, and situation, was cooperative, had clear speech, was coherent and productive, with good comprehension, euthymic mood and affect, thought process and content intact, memory intact for past and present events, able to do simple calculation, and answered appropriately to similarity and judgment questions. The plan at Axis I was to rule out bipolar II, chronic PTSD with residual symptoms, secondary to childhood sexual trauma, Nicotine dependence, and past history of alcohol dependence; Axis II was deferred; Axis III hypertension, myalgia status post three C-sections and septoplasty; Axis IV unemployment and minor problems in the primary family and Axis V GAF 60, moderate impairment. Treatment plan was to increase the Wellbutrin morning dose to 150 mg, with 75mg at noon, taper off and discontinue Xanax and start mirtazapine at bedtime and, if she tolerates this, will increase the mirtazapine to 15 mg, hydroxyzine after stopping Xanax to treat both anxiety and insomnia and follow-up in two months;

50. A July 12, 2006 ECG Report indicated normal sinus rhythm, nonspecific T wave abnormality, abnormal ECG with no significant change found June 5, 2006;

51. A July 14, 2006 Progress Note from VAMC indicated Anderson reported having episodes of chest pain two to three times

22

a week with associated shortness of breath and radiating pain to bilateral upper extremities, neck and left jaw, rapid heart rate, and palpitations, chills and tingling that radiates to arms and face. A stress test was negative for chest pain but positive for nonspecific ST-T changes but negative for ischemia. Anderson's vital signs were stable and she was alert and oriented. The assessment was chest pain of uncertain etiology with positive risk factors. Recommendation was a consultation with cardiology;

52. A July 31, 2006 Cardiology Consult report from VAMC indicating Anderson's chief complaint was chest pain and some stomach pain especially with fried foods. Physical examination revealed clear lungs and a regular heart. The impression was atypical chest pain that had doubtful cardiac origin, a negative stress EKG and no ischemia. Recommendation was to continue current regimen;

53. An August 24, 2006 chest exam report from VAMC identified no consolidation, effusion, or pneumothorax, a mild increase in interstitial markings seen due to tobacco abuse, straightening of left heart border, and otherwise unremarkable cardiomediastinal silhouette. The impression was no acute process identified;

54.  An October 4, 2006 Pathology Report indicated very minute fragment of squamous type epithelium focal slight disarray of squamous type epithelial cells;

55.  An October 4, 2006 Progress note from VAMC indicated Anderson reported not getting enough sleep and doing well on medications. Mental status exam revealed Anderson interacted well, had a good range of affect, did not exhibit any suicidal or homicidal ideation, and had intact mental status. The diagnosis was Axis I chronic PTSD with residual symptoms secondary to childhood sexual trauma, rule out bipolar II - very likely by history, needs further observation to confirm; alcohol dependence in full, sustained recovery; nicotine dependence and Axis V GAF 60 to 65, which indicates moderate impairment. Treatment plan was to continue medications, avoid Xanax, use relaxation, and cut down on tobacco usage;

56.  An October 11, 2006 psychiatric note indicating Anderson had symptoms of PTSD and a GAF estimate of 60-65 that indicates only mild symptoms;

57.  An October 16, 2006 Primary Care Visit record from VAMC indicated Anderson reported chest pain and epigastric pain occasionally associated with meals. Cardiology consult reveals this chest pain is likely non-cardiac;

58. A November, 2006 note indicating Anderson had no significant abnormality in her abdomen, other than extensive reflux.

59. A January 9, 2007 Psychiatry Note from VAMC indicated Anderson reported being stressed. Examination revealed Anderson presented and interacted well, had a good range of affect, did not exhibit any suicidal or homicidal ideation, and had intact mental status. The diagnoses Axis I chronic PTSD with residual symptoms secondary to childhood sexual trauma; bipolar II - provisional diagnosis; alcohol dependence, in full sustained recovery; nicotine dependence, has cut down, but not able to quit, and Axis V GAF 60 to 65, that indicates moderate impairment. The treatment plan was to continue same medications, exercise regularly and follow sleep hygiene;

60. A January 22, 2007 Primary Care Visit progress note from VAMC indicating Anderson was doing much better, her stomach pain was significantly improved;

61. An April 23, 2007 Psychiatry Note from VAMC indicated that Anderson very likely still suffers from bipolar II along with PTSD, secondary to childhood sexual trauma and was going to take herbal medication. Examination revealed Anderson presented and interacted well, had a good range of affect, did not exhibit any

suicidal or homicidal ideation and had intact mental status. Assessment was Axis I chronic PTSD with residual symptoms, secondary to childhood sexual trauma; bipolar II, by history; alcohol dependence in full sustained recovery; nicotine dependence and Axis V GAF 60 to 65, which indicated moderate impairment. Treatment plan was to continue medications, encouraged Anderson to exercise regularly and follow sleep hygiene;

62. A July 20, 2007 Primary Care Visit progress note indicated Anderson reported no acute problems today but did have more muscle spasms in low back; and

63. An August 24, 2007 Medical Assessment of Ability to do Work-Related Activities (Mental) from K. Smekle, M.D. indicated Anderson was capable of making occupational adjustments as follows: good ability to follow work rules and function independently, fair ability to relate to co-workers, deal with public, use judgment, interact with supervisors, and maintain attention and concentration, and poor ability to deal with work stresses; making performance adjustments: good ability to understand, remember, and carry out detailed, but not complex job instructions and understand, remember, and carry out simple job instructions, and fair ability to understand, remember, and carry out complex job instructions; making personal-social adjustments:

good ability to maintain personal appearance and fair ability to behave in an emotionally stable manner, relate predictability in social situations, and demonstrate reliability.

## VI. DISCUSSION

The Commissioner contends the ALJ followed the applicable regulations, and that, pursuant to SSR 96-7p in particular, there is substantial evidence in the record to support the ALJ's credibility finding. Anderson, on the other hand, argues that the ALJ improperly applied SSR 96-7p in assessing her credibility.

SSR 96-7p establishes the procedure for determining disability in instances involving a credibility finding. Its purpose is

> to clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision.

1996 WL 374186, 1.

SSR 96-7p prohibits a disability finding based on symptoms alone. A claimant must produce "medical signs and laboratory findings demonstrating the existence of a medically determinable

physical or mental impairment(s) that could reasonably be expected to produce the symptoms." Id. Should evidence of such an impairment exist, the adjudicator must evaluate "the extent to which the symptoms affect the individual's ability to do basic work activities." Id. If the adjudicator is unable to make a fully favorable decision based on objective medical evidence alone, then he must determine the credibility of the claimant's own statements about symptoms. Id.

In this determination, the adjudicator must consider the individual's statements in combination with the rest of the record, including objective evidence and information provided by health care professionals. The adjudicator, however, may not disregard the claimant's statements solely because no objective medical evidence supports them. Id.

Finally, SSR 96-7p requires that the adjudicator's credibility analysis be supported by reasoning and evidence. Further, it must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at 2.

In the seminal case of Craig v. Chater, 76 F.3d 585 (4th Cir. 1996), the Fourth Circuit established a two-prong test for evaluating a claimant's subjective complaints of pain. The first

prong requires an ALJ to determine whether the objective evidence of record establishes the existence of a medical impairment or impairments resulting from anatomical, physiological or psychological abnormalities that could reasonably be expected to produce the pain or other symptom alleged. Id. at 594. Under the second prong, an ALJ must "expressly consider" whether a claimant has such an impairment. Id. at 596. If a claimant satisfies these two prongs, an ALJ then must evaluate the "intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." Id. at 595. In this evaluation, an ALJ must consider

> not only the claimant's statements about her pain, but also 'all the available evidence,' including the claimant's medical history, medical signs, and laboratory findings . . . and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Id.

Prior to Craig, in Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984), the Fourth Circuit stated that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight" (citing Tyler v.

<u>Weinberger</u>, 409 F.Supp. 776 (E.D. Va. 1976)). Once made, an ALJ's credibility determination will be reversed only "if the claimant can show it was 'patently wrong.'" <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000) (quoting <u>Herr v. Sullivan</u>, 912 F.2d 178, 181 (7th Cir. 1990)). Nevertheless, despite this great deference, SSR 96-7p requires an ALJ to articulate sufficiently the reasons for his credibility determination.

In this case, the ALJ determined that Anderson had satisfied the two prongs of <u>Craig</u>, and that her medically determinable impairments could reasonably be expected to produce the symptoms she alleged. However, he then found that Anderson's statements concerning the intensity, persistence and limiting effects of the symptoms were not entirely credible.

When the Magistrate Judge reviewed these findings, he noted that the ALJ had considered the criteria in 20 C.F.R. § 404.1529(c)(3)(I)-(vii) as part of his evaluation of Anderson's symptoms. Those criteria include:

(i) a claimant's daily activities;

(ii) the location, duration, frequency, and intensity of a claimant's pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication a claimant takes or has taken to alleviate his pain or other symptoms;

(v) Treatment, or other medication, a claimant receives or has received for relief of his pain or other symptoms;

(vi) Any measures a claimant uses or has used to relieve pain or other symptoms; and

(vii) Other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.

When considering these criteria, pursuant to SSR 96-7p, an ALJ must determine their limiting effects on a claimant's capacity for work, and specifically articulate the evidence in the record supporting his credibility finding in a manner that permits any reviewer to follow his reasoning.

As to Anderson's credibility, the ALJ found:

> The claimant is not entirely credible, particularly with regard to her allegations of pain, limitations, and overall disability. Upon clinical testing via the MMPI-2, the claimant was noted to have very likely exaggerated her symptoms. The medical evidence indicates that the claimant was fired from her job because of missed days, apparently without medical excuse. Moreover, the claimant's alleged loss of balance has affected her for a long time, at least since 1987, yet the claimant was able to maintain employment despite her impairments through that time. After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged

31

> symptoms, but that the claimant's statements
> concerning the intensity, persistence and
> limiting effects of these symptoms are not
> entirely credible.

When the Magistrate Judge reviewed this credibility finding, he determined that the ALJ's analysis was inadequate because, although the ALJ had recited the factors under 20 C.F.R. § 404.1529(c)(3)(I)-(vii), he did not satisfactorily articulate his reasoning in accord with SSR 96-7p. Specifically, the ALJ only referenced Anderson's daily activities when evaluating whether her impairments met or were medically equal to one of the listed impairments; notably, he recognized that Anderson did minimal cooking and some light house cleaning, including washing dishes. In his consideration of the location, duration, frequency, and intensity of Anderson's pain, however, the ALJ stated only that (1) the report from Dr. Pearse's office[1] noted she had "very likely exaggerated her symptoms," and (2) Anderson had maintained employment for several years despite being affected by loss of balance since 1987. (Magistrate Judge's R&R at p. 36). Importantly, the ALJ failed to consider factors that could have precipitated or aggravated Anderson's symptoms, and did not weigh the effects, if

---

[1]     The May 11, 2005 report was prepared by Peggy J. Allman, M.A., a licensed psychologist, but it is on the stationery of Ronald D. Pearse, Ed.D, also a licensed psychologist.

any, of her medications on Anderson's ability to maintain employment. Nor did he consider any treatments or other measures Anderson took to relieve her pain. As the Magistrate Judge noted, the ALJ's credibility analysis consisted only of a brief finding that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Magistrate Judge's R&R at pp. 36-7.)

Relying on the case of <u>Neave v. Astrue</u>, 507 F.Supp.2d 948, 962 (E.D.Wis. 2007), the Commissioner argues that the Magistrate Judge's conclusion as to the inadequacy of the ALJ's credibility analysis is inconsistent with his acknowledgment that the ALJ did not have to elaborate on each of the factors contained in the regulations. This argument misses the point, however. Although <u>Neave</u> held that ". . . the ALJ need not elaborate on each of these factors when making a credibility determination," it also emphasized that the ALJ must "<u>sufficiently articulate his assessment of the evidence to assure the court that he considered the important evidence and to enable the court to trace the path of his reasoning</u>." <u>Id</u>. (emphasis added). Here, based on the fact that the ALJ had not specifically documented the evidence in the record on which he relied, and consequently failed to provide a traceable path for the criteria he did consider, the Magistrate Judge

correctly determined that the ALJ's credibility analysis was inadequate.

Based on its <u>de novo</u> review of the R&R and the evidence of record, the Court agrees with the Magistrate Judge's recommendation to remand this case to the Commissioner so that the ALJ can perform a proper credibility analysis.

## VII. <u>CONCLUSION</u>

Following a careful review of the Commissioner's objections, the Court concludes that he has not raised any issues that were not thoroughly considered by Magistrate Judge James E. Seibert in his R&R. Moreover, after an independent <u>de novo</u> consideration of all matters now before it, the Court is of the opinion that the R&R accurately reflects the law applicable to the facts and circumstances before it in this action. Therefore, the Court **ACCEPTS** Magistrate Judge Seibert's R&R in whole and **ORDERS** that this civil action be disposed of in accordance with the recommendation of the Magistrate Judge. Accordingly,

1. The Court **DENIES** the plaintiff's motion for Summary Judgment (Docket No. 8);

2. The Court **DENIES** defendant's motion for Summary Judgment (Docket No. 10);

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

3.  The Court **REMANDS** the case to the Commissioner for consideration pursuant to the recommendations contained in the Magistrate Judge's R&R; and

4.  This Court **DISMISSES** the case **WITH PREJUDICE** and **RETIRES** it from the docket of this Court.

The Clerk of Court is directed to enter a separate judgment order. Fed.R.Civ.P. 58. If a petition for fees pursuant to the Equal Access to Justice Act (EAJA) is contemplated, the plaintiff is warned that, as announced in <u>Shalala v. Schaefer</u>, 113 S.Ct. 2625 (1993), the time for such a petition expires ninety days after entry of judgment. The Court directs the Clerk of Court to transmit copies of this Order to counsel of record.

DATED: March 31, 2011

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE